# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MERCK & CO., INC.,

      Plaintiff,

   v.

XAVIER BECERRA, U.S. Secretary of
Health & Human Services; *et al.*,

      Defendants.

Civil Action No. 23-cv-1615-CKK

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Yaakov M. Roth (D.C. Bar 995090)
Megan Lacy Owen (D.C. Bar 1007688)
Brinton Lucas (D.C. Bar 1015185)
John Henry Thompson (*admission pending*)
Louis J. Capozzi III (*admission pending*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20012
(202) 879-3939

*Attorneys for Plaintiff*
*Merck & Co., Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 4

    A.  The Federal Government Controls Nearly Half of the Prescription
        Drug Market in the United States ................................................... 4

    B.  The IRA Compels Manufacturers To "Agree" To Sell Their Drugs at
        Heavily Discounted "Fair" Prices ................................................. 5

    C.  The Government Falsely Markets the Program as "Voluntary." ................ 9

    D.  Merck Will Imminently Be Subject to the Program ................................. 10

LEGAL STANDARD ........................................................................................... 11

ARGUMENT ...................................................................................................... 11

I.     THE PROGRAM TAKES PROPERTY WITHOUT JUST COMPENSATION AND
      THUS VIOLATES THE FIFTH AMENDMENT ............................................. 13

    A.  The Takings Clause Forbids Governmental Appropriation of
        Personal Property Without Just Compensation ......................................... 13

    B.  The Program Appropriates Private Property Without Paying Just
        Compensation ............................................................................. 16

    C.  Declaratory Relief Is Appropriate and Warranted .................................... 20

II.    THE PROGRAM COMPELS MANUFACTURERS TO ENDORSE POLITICAL
      MESSAGES AND THUS VIOLATES THE FIRST AMENDMENT ................................. 22

    A.  The First Amendment Forbids the Government To Conscript Others
        To Convey Its Political Messages ............................................... 23

    B.  The Program Forces Manufacturers To Express "Agreement" with
        HHS's Prices and To Endorse Their "Fairness." ..................................... 26

    C.  Injunctive Relief Is Appropriate and Warranted ...................................... 34

III.   MERCK DID NOT VOLUNTARILY SUBMIT TO THE PROGRAM'S DEMANDS BY
      PARTICIPATING IN MEDICARE AND MEDICAID ................................................ 35

A.   The IRA's "Choice" Is Coercive, Not Voluntary .......................................... 37

B.   Threatening Merck's Access to Half the U.S. Drug Market To Compel Sales and Speech Is Unconstitutional .......................................... 44

CONCLUSION........................................................................................................... 48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*303 Creative LLC v. Elenis*,
  No. 21-476, 2023 WL 4277208 (U.S. June 30, 2023)....................................*passim*

*Action All. of Senior Citizens v. Leavitt*,
  483 F.3d 852 (D.C. Cir. 2007) ................................................................. 4

*\*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013) ....................................................................*passim*

*Alaska Packers' Ass'n v. Domenico*,
  117 F. 99 (9th Cir. 1902) ......................................................................... 41

*Am. Hosp. Ass'n v. Azar*,
  983 F.3d 528 (D.C. Cir. 2020) ............................................................... 11

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) (en banc) ................................................ 25

*Armstrong v. United States*,
  364 U.S. 40 (1960) ................................................................................. 13

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ............................................................................. 4

*Bowles v. Willingham*,
  321 U.S. 503 (1944) ............................................................................... 15

*\*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) ...................................................................*passim*

*Cent. Illinois Light Co. v. Citizens Util. Bd.*,
  827 F.2d 1169 (7th Cir. 1987) .............................................................. 31

*Circle Sch. v. Pappert*,
  381 F.3d 172 (3d Cir. 2004)................................................................... 29

*Cummings v. Premier Rehab Keller, PLLC*,
 142 S. Ct. 1562 (2022) ............................................................... 35, 38, 41

*Doe v. Univ. of Scis.*,
 961 F.3d 203 (3d Cir. 2020) ........................................................ 42

*\*Dolan v. City of Tigard*,
 512 U.S. 374 (1994) ............................................................. 45, 46, 47

*Duke Power Co. v. Carolina Envt'l Study Grp.*,
 438 U.S. 59 (1978) ......................................................................... 20

*Duquesne Light Co. v. Barasch*,
 488 U.S. 299 (1989) ...................................................................... 15

*E. Texas Baptist Univ. v. Burwell*,
 807 F.3d 630 (5th Cir. 2015) ........................................................ 31

*Eastern Enters. v. Apfel*,
 524 U.S. 498 (1998) ................................................................. 18, 21

*Elrod v. Burns*,
 427 U.S. 347 (1976) ................................................................. 34, 45

*Expressions Hair Design v. Schneiderman*,
 581 U.S. 37 (2017) ................................................................... 24, 30

*FCC v. League of Women Voters*,
 468 U.S. 364 (1984) ...................................................................... 47

*Frost & Frost Trucking Co. v. R.R. Comm'n*,
 271 U.S. 583 (1926) ............................................................. 38, 40, 44

*Garelick v. Sullivan*,
 987 F.2d 913 (2d Cir. 1993) ...................................................... 15, 17

*Harris v. McRae*,
 448 U.S. 297 (1980) ...................................................................... 46

*Hartford-Empire Co. v. United States*,
 323 U.S. 386 (1945) ...................................................................... 16

\*_Horne v. Dep't of Agric._,
   576 U.S. 351 (2015) ....................................................................................._passim_

_Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc._,
   515 U.S. 557 (1995) ................................................................................. 23

_Ill. Tool Works Inc. v. Indep. Ink, Inc._,
   547 U.S. 28 (2006) .................................................................................. 47

_Jackson v. Culinary Sch. of Washington, Ltd._,
   27 F.3d 573 (D.C. Cir. 1994) .................................................................. 20

_James v. Campbell_,
   104 U.S. 356 (1882) ................................................................................ 16

_Janus v. Am. Fed'n of State, Cnty., & Mun. Employees_,
   138 S. Ct. 2448 (2018) ........................................................................... 12

_Jefferson Par. Hosp. Dist. No. 2 v. Hyde_,
   466 U.S. 2 (1984) .................................................................................... 48

_Kingdomware Techs., Inc. v. United States_,
   579 U.S. 162 (2016) ................................................................................ 36

_Knox v. SEIU_,
   567 U.S. 298 (2012) ................................................................. 23, 24, 28

\*_Koontz v. St. Johns River Water Mgmt. Dist._,
   570 U.S. 595 (2013) ............................................................... 44, 45, 48

_Koslow v. Pennsylvania_,
   302 F.3d 161 (3d Cir. 2002) .................................................................. 42

_Loretto v. Teleprompter Manhattan CATV Corp._,
   458 U.S. 419 (1982) ................................................................................ 14

_Murdock v. Pennsylvania_,
   319 U.S. 105 (1943) ................................................................................ 18

\*_Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)_,
   567 U.S. 519 (2012) ................................................................................._passim_

*New Hope Family Services, Inc. v. Poole,
    966 F.3d 145 (2d Cir. 2020) .......................................................................... 29, 30

NIFLA v. Becerra,
    138 S. Ct. 2361 (2018) ........................................................................ 12, 25, 34

*Nollan v. Cal. Coastal Comm'n,
    483 U.S. 825 (1987) ...................................................................................... 45, 46

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n,
    475 U.S. 1 (1986) ........................................................................................passim

Pennhurst State Sch. & Hosp. v. Halderman,
    451 U.S. 1 (1981) ............................................................................................. 38

Perry v. Sindermann,
    408 U.S. 593 (1972) ........................................................................................ 45

R.J. Reynolds Tobacco Co. v. FDA,
    696 F.3d 1205 (D.C. Cir. 2012)....................................................................... 33

Riley v. Nat'l Fed'n of the Blind,
    487 U.S. 781 (1988) ................................................................................ 23, 25, 34

Rumsfeld v. FAIR,
    547 U.S. 47 (2006) .......................................................................................... 29

Sanofi Aventis U.S. LLC v. HHS,
    58 F.4th 696 (3d Cir. 2023) ......................................................................... 4, 40

Sorrell v. IMS Health Inc.,
    564 U.S. 552 (2011) ........................................................................................ 25

Steffel v. Thompson,
    415 U.S. 452 (1974) ........................................................................................ 20

Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection,
    560 U.S. 702 (2010) ........................................................................................ 14

Telescope Media Grp. v. Lucero,
    936 F.3d 740 (8th Cir. 2019) .......................................................................... 29

*Thomas v. Collins*,
　　323 U.S. 516 (1945) ......................................................................... 23

*\*Turner Broad. Sys., Inc. v. FCC*,
　　512 U.S. 622 (1994) ............................................................. 23, 24, 25

*United States v. Butler*,
　　297 U.S. 1 (1936) .......................................................... 37, 38, 40, 42

*United States v. General Motors*,
　　323 U.S. 373 (1945) ..................................................................... 16, 18

*United States v. Reynolds*,
　　397 U.S. 14 (1970) ........................................................................ 15, 18

*United States v. United Foods, Inc.*,
　　533 U.S. 405 (2001) ............................................................................ 25

*United States v. Williams*,
　　553 U.S. 285 (2008) ............................................................................ 43

*W. Va. State Bd. of Educ. v. Barnette*,
　　319 U.S. 624 (1943) ..................................................................... 23, 28

*Wooley v. Maynard*,
　　430 U.S. 705 (1977) ........................................................ 23, 28, 31, 34

*Yee v. City of Escondido*,
　　503 U.S. 519 (1992) ..................................................................... 15, 17

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
　　471 U.S. 626 (1985) ............................................................................ 25

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. Art. I, § 8............................................................................ 35

U.S. Const. amend. V............................................................................ 13

26 U.S.C. § 5000D..................................................................*passim*

28 U.S.C. § 2201.................................................................................... 20

29 U.S.C. § 794 ............................................................................................... 35

42 U.S.C. § 300a–6 ......................................................................................... 35

42 U.S.C. § 1320f .................................................................................... 5, 7, 36

42 U.S.C. § 1320f–1 .................................................................................... 5, 6

42 U.S.C. § 1320f–2 ................................................................................*passim*

42 U.S.C. § 1320f–3 ......................................................................... 6, 7, 18, 36

42 U.S.C. § 1320f–4 .................................................................................... 7, 26

42 U.S.C. § 1320f–6 ............................................................................................ 7

42 U.S.C. § 1320f–7 .......................................................................................... 18

42 U.S.C. § 1395k ............................................................................................... 4

42 U.S.C. § 1395w–3a ....................................................................................... 4

42 U.S.C. § 1395w–111 ............................................................................... 4, 40

42 U.S.C. § 1395w–114a .......................................................................... 8, 42, 43

42 U.S.C. § 1395x ............................................................................................... 4

42 U.S.C. § 1396r–8 .................................................................................... 5, 8, 36

42 U.S.C. § 2000d ............................................................................................ 35

## OTHER AUTHORITIES

167 Cong. Rec. H6375-04 (daily ed. Nov. 18, 2021) ...................................... 9

168 Cong. Rec. H7561-02 (daily ed. Aug. 12, 2022) ...................................... 9

168 Cong. Rec. S4070-01 (daily ed. Aug. 6, 2022) ......................................... 9

168 Cong. Rec. S4070-02 (daily ed. Aug. 6, 2022) ......................................... 9

M. Berman, *Coercion, Compulsion, and the Medicaid Expansion: A Study in the Doctrine of Unconstitutional Conditions*, 91 TEX. L. REV. 1283 (2013) ................................................................. 42

Pres. Biden's State of the Union Address (Feb. 7, 2023)............................. 9

1 Blackstone's Commentaries (1803) ......................................................... 13

J. Blumstein, *Enforcing Limits on the Affordable Care Act's Mandated Medicaid Expansion: The Coercion Principle and the Clear Notice Rule*, 2012 CATO SUP. CT. REV. 67.......................................................... 41

CMS, *Fact Sheet: The Inflation Reduction Act Lowers Health Care Costs for Millions of Americans* (Oct. 5, 2022) ......................................... 9

Cong. Rsch. Serv., *Tax Provisions in the Inflation Reduction Act of 2022 (H.R. 5376)* (2022)............................................................................. 7

P. Hamburger, PURCHASING SUBMISSION (2021) ....................................... 47

Joint Comm. on Tax'n, Estimated Budget Effects of the Revenue Provisions of Title XIII—Committee On Ways And Means, of H.R. 5376, Fiscal Years 2022–2031 (Nov. 19, 2021)......................................... 8

R. Knox, Note, *More Prices, More Problems*, 18 YALE J. HEALTH POL'Y, L. & ETHICS 191 (2019)....................................................................... 4, 5

T. Merrill, *Anticipatory Remedies for Takings*, 128 HARV. L. REV. 1630 (2015) ................................................................................................... 22

National Tracking Poll, Morning Consult (Sept. 2021) ........................... 33

Remarks by Pres. Biden on Medicare and the Inflation Reduction Act (Sept. 27, 2022)...................................................................................... 9

J. Rubenfeld, *Usings*, 102 YALE L.J. 1077 (1993) ................................... 13

*White House Says It Will Win Merck Lawsuit, Defends Medicare Drug Negotiations*, REUTERS (June 6, 2023)...................................................... 9

## **INTRODUCTION**

In the Inflation Reduction Act (IRA) enacted last summer, Congress created a new "Drug Price Negotiation Program" for Medicare (the Program). The name suggests Congress wanted Medicare to negotiate prices with the manufacturers of prescription drugs. And that is certainly how the Program was sold to the American people. After all, why shouldn't Medicare be allowed to negotiate prices with its suppliers? That is how our economy works: We trust open bargaining to result in voluntary agreements that maximize social welfare. Unsurprisingly, polls show that authorizing Medicare to negotiate drug prices enjoys broad approval.

Despite its name and marketing, however, the Program involves no genuine negotiations and no voluntary agreements. For if Congress had merely empowered Medicare to negotiate over drug prices, that would have created a risk that the parties would not reach a deal, leaving some drugs unavailable to beneficiaries. Congress could not afford to take that political risk: It needed to reduce Medicare's costs while still *guaranteeing* American seniors unrestricted access to their medications.

The Program therefore uses the threat of enormous monetary penalties to *compel* manufacturers to provide Medicare beneficiaries with "access" to their drugs at whatever discounted price the Government, in its unreviewable discretion, selects. It then *disguises* those forced transfers as the product of a negotiated agreement, to deceive the public into thinking the manufacturers have "agreed" that these prices are "fair," and thereby to conceal the reality of the Program's radical central-planning approach (and concomitant harms to future innovation).

1

This is not "negotiation."  It is tantamount to extortion.  And it violates the Constitution in at least two respects.

*First*, the Fifth Amendment requires the Government to pay just compensation if it takes private property for public use.  But the whole point of the Program is to take prescription drugs *without* paying their fair value.  It uses the threat of crippling penalties to force manufacturers to transfer their products to Medicare beneficiaries for a fraction of their worth.  The Program thus requisitions property for public use but—by design—refuses to pay just compensation.  It instead uses coercive sanctions to seize discounted goods for the pecuniary benefit of the Government (as the insurer of Medicare beneficiaries).  That amounts to a classic *per se* taking.

*Second*, the IRA's mechanism for effecting these takings is an offense to the First Amendment.  Instead of simply empowering the Department of Health and Human Services (HHS) to set the prices that Medicare will pay for covered drugs, the Program operates through a charade of sham "negotiations" that concludes with the manufacturers entering public "agreements" confessing that HHS's prices are "fair." The only purpose served by that circuitous process is political deception—to allow the Government to pretend that HHS is entering voluntary agreements with businesses who concede that the resulting prices are fair.  Yet conscripting companies to conceal unpopular price-setting is exactly the parroted orthodoxy that the First Amendment's compelled-speech doctrine is meant to forbid.  If the Government wants to justify turning American drug innovators into the equivalent of public utilities, it must do so using its own voice, not by forcing the industry to feign agreement.

These constitutional violations cannot be excused by pretending the companies voluntarily waived their rights by participating in Medicare or Medicaid. The Program does not impose *conditions* on participation in those programs, enforced by *exclusion* for those that breach. Rather, it imposes affirmative *mandates* to negotiate and agree, backed by severe *penalties* for those that refuse. Indeed, a manufacturer's participation in Medicare and Medicaid matters only on the back end: The IRA's penalties can be "suspended" if a manufacturer terminates such participation—not just for the drug at issue but for *all* its products, thereby abandoning tens of millions of patients and losing access to almost half of the U.S. prescription drug market.

Even characterized as a condition, that is unconstitutional. The Government cannot leverage its Spending Clause power and dominance of the prescription drug market to coerce manufacturers to abandon their constitutional rights. The IRA does not offer any voluntary choice. Rather, it has all the classic hallmarks of an unconstitutional condition: It extracts concessions respecting *one* product by holding hostage *distinct* transactions involving *other* products; it offers a false "choice" that is clearly designed to coerce; and it exploits decades of reliance on Congress's statutory promise that Medicare would not interfere with private pricing negotiations.

In short, the IRA uses severe penalties to requisition medicines while refusing to pay their true value—while coercing manufacturers to pretend it is all "fair." The Constitution does not countenance this charade. This Court should declare that the Program effects uncompensated takings under the Fifth Amendment, and enjoin its regime of sham "agreements" under the First Amendment.

3

## BACKGROUND

### A.   The Federal Government Controls Nearly Half of the Prescription Drug Market in the United States.

The Government "dominates" the prescription drug market, accounting "for almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).

The largest program is Medicare, which covers "nearly 60 million aged or disabled Americans." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019). As relevant here, Medicare operates two major prescription drug programs. Part B covers drugs administered by a physician. 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(2)(A). Part D allows eligible individuals to enroll in privately operated plans for self-administered prescription drugs, with Medicare covering most of the premium costs. *See Action All. of Senior Citizens v. Leavitt*, 483 F.3d 852, 854 (D.C. Cir. 2007). Through these two programs, Medicare "comprises approximately 40 percent of the pharmaceutical market in the United States." R. Knox, Note, *More Prices, More Problems*, 18 YALE J. HEALTH POL'Y, L. & ETHICS 191, 202 (2019) (Knox).

Historically, both programs relied on market-based pricing. Medicare Part B reimbursement rates are based on an "average sales price" methodology. 42 U.S.C. § 1395w–3a. And when Congress enacted Medicare Part D, it prohibited HHS from "interfer[ing] with the negotiations between drug manufacturers and pharmacies and [private plan sponsors]." *Id.* § 1395w–111(i). Plan sponsors, indeed, "can and do negotiate prices with prescription drug manufacturers," and have market incentives to secure lower pharmaceutical prices. Knox, *supra*, at 206–07.

The Government's second major drug benefit program is operated by Medicaid, which provides health coverage for more than 70 million low-income Americans. *See id.* at 208–09. Medicaid programs are jointly administered by the States, and all state programs offer at least some prescription drug benefits for at least some classes of eligible beneficiaries. *See id.* at 209.

These two programs are linked: A manufacturer's products cannot be covered by Medicare Part B unless it signs agreements to offer its products through Medicaid. *See* 42 U.S.C. § 1396r–8(a)(1); Knox, *supra*, at 209–10.

## B.   The IRA Compels Manufacturers To "Agree" To Sell Their Drugs at Heavily Discounted "Fair" Prices.

The IRA's Program revolutionizes how the Government pays for prescription drugs. Using the threat of enormous penalties, the IRA coerces manufacturers to enter "negotiations" with HHS and then to reach "agreements" committing to transfer their most valuable pharmaceutical products to Medicare beneficiaries at steep, agency-dictated discounts inuring to the Government's benefit.

The Program begins with HHS and its sub-agency, the Centers for Medicare & Medicaid Services (CMS) selecting the covered drugs. In September 2023, the agency must select 10 drugs, for which price agreements will take effect in 2026. *See* 42 U.S.C. §§ 1320f(d), 1320f–1(a)(1). In February 2025 and February 2026, HHS must add 15 new drugs for pricing in 2027 and 2028 respectively. *Id.* § 1320f–1(a)(2)–(3). Starting in February 2027, the Secretary must annually choose 20 new drugs to add. *Id.* § 1320f–1(a)(4). The IRA directs HHS to pick drugs based on their total cost to Medicare over the prior 12 months. *Id.* § 1320f–1(b)(1)(A).

Drug selection is cumulative: Each year HHS picks an *additional* 10, 15, or 20 new drugs to add to the program.  Meanwhile, previously selected drugs remain subject to the Program until HHS determines that a generic or biosimilar version of the drug is approved and marketed.  *Id.* § 1320f–1(c)(1).

After HHS selects the first 10 drugs in September 2023, manufacturers will have until October 1 to "enter into agreements" whereby they pledge to participate in the Program's "negotiation" and ultimately accept a "maximum fair price" (MFP) at which they must sell the drug.  *Id.* § 1320f–2(a).  Manufacturers will be required to sign a written contract agreeing to participate in the Program.  Decl. of Jacob Roth (Roth Decl.), Exh. A (CMS Revised Guidance) at 118.  That contract uses the words "agree" and "fair" dozens of times.  *See* Roth Decl. Exh. B (Template Agreement).

The Secretary then kicks off the "negotiation" process by issuing a "written initial offer" along with a "concise justification."  42 U.S.C. § 1320f–3(b)(2)(B).  The IRA sets a *ceiling* on the price that HHS may offer, calculated as a percentage of a benchmark market-based price (the non-federal average manufacturer price).  The ceiling ranges from (at the top end) 75% of that benchmark for recently approved drugs down to just 40% for drugs that have been approved for over 16 years.  *Id.* § 1320f–3(b)(2)(F), (c)(1)(C).  In other words, the Program mandates a Government discount of *at least* 25% to 60% from a market benchmark.  And there is no *floor* on the price HHS may offer.  Indeed, the Secretary effectively enjoys uninhibited—and supposedly unreviewable, *id.* § 1320f–7—discretion.  The IRA merely instructs him to *consider* various factors in setting the price.  *Id.* § 1320f–3(b)(2)(C)(ii), (e).

Following some back and forth, the "negotiations" for the first round of the Program must end by August 1, 2024.  42 U.S.C. §§ 1320f(d)(5)(C), 1320f–3(b)(2)(E). By that date, the manufacturer must "respond in writing" to the Secretary's "final offer."  CMS Revised Guidance 158.  To "accept," a manufacturer must "formalize agreement on an MFP" by signing an "Addendum" that "sets forth the agreed-upon MFP."  *Id.* at 159; *see also* Template Agreement at 7 (setting forth this "Negotiated Maximum Fair Price Addendum").  HHS will "publish," for public consumption, the MFP "negotiated with the manufacturer," along with its curated "explanation" for that price.  42 U.S.C. § 1320f–4(a); CMS Revised Guidance 162–63.

Upon "agreement" on an MFP, the manufacturer becomes obligated to provide "access to such price to" Medicare beneficiaries (beginning in 2026 for the first cycle). *Id.* § 1320f–2(a)(1).  Failure to provide "access" triggers a civil monetary penalty of 10 times the difference between the price the manufacturer charges and the MFP, per unit sold, *id.* § 1320f–6(a), plus a $1 million-per-day penalty for violation of the manufacturer's "agreement" to provide such "access," *id.* § 1320f–6(c).

Critically, although the statute speaks of "agreements," manufacturers are coerced to enter into those "agreements" by threat of draconian tax penalties.  If a manufacturer refuses to sign the initial agreement to "negotiate," or fails to "agree" to the final MFP by the deadline, it begins to incur a daily "excise tax" that starts at 186% (and escalates over time to 1,900%) of the drug's total daily revenues (from *all* sources, not just Medicare).  *See* 26 U.S.C. § 5000D; Cong. Rsch. Serv., *Tax Provisions in the Inflation Reduction Act of 2022 (H.R. 5376)* at 4, tbl. 2 (2022).

As those figures suggest, Congress designed this scheme to guarantee "agreement"—the confiscatory penalties make it irrational *not* to agree.  Congress thus projected this "tax" to raise "no revenue."  Joint Comm. on Tax'n, Estimated Budget Effects of the Revenue Provisions of Title XIII—Committee On Ways And Means, of H.R. 5376, Fiscal Years 2022–2031, at 8 (Nov. 19, 2021).

The only way to avoid this tax is for a manufacturer to terminate the contracts that allow Medicare and Medicaid to cover its products.  The statute "suspend[s]" the penalty on days when a company is a party to no such agreements—not just for the drug at issue, but for *any* products.  26 U.S.C. § 5000D(c).[1]  So, a manufacturer can avoid the Program *only* by forfeiting its access to half of the U.S. prescription drug market, leaving tens of millions of Americans without their medications.

And even there, Congress designed the "choice" to be illusory.  The IRA delays a manufacturer's ability to end Medicare Part D agreements for between 11 and 23 months.  42 U.S.C. § 1395w–114a(b)(4)(B).  To avoid a penalty for failure to sign the initial agreement by October 1, 2023, a company thus would have had to terminate by January 31, 2022—months before the IRA became law.  In response to litigation, CMS developed a purported "fix": The agency has the power to *punish* manufacturers by terminating them more quickly for "violation[s]" or other "good cause."  *Id.*  CMS now dubiously claims it will use that authority to *help* manufacturers who wish to circumvent the statutory delay.  *See* CMS Revised Guidance 120–21, 130–31.

---

[1] The statute refers only to Medicare Part D and Medicaid agreements, but the latter is a prerequisite to Medicare Part B coverage, 42 U.S.C. § 1396r–8(a)(1), so avoiding the IRA's tax would require forfeiting those payments too.

**C.      The Government Falsely Markets the Program as "Voluntary."**

The Government has repeatedly characterized the Program as a system of "negotiations" culminating in "voluntary" "agreements."  The statute itself brands its scheme as a "Negotiation Program" and uses the word "negotiation" dozens of times. Its supporters in Congress hewed carefully to that line.[2]

So has the Administration.  On signing the IRA, the President claimed it merely gave Medicare "the power to negotiate lower prescription drug prices." Remarks by Pres. Biden on Medicare and the Inflation Reduction Act (Sept. 27, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/09/27/remarks-by-president-biden-on-medicare-and-the-inflation-reduction-act/.  He made the same assertion during his 2023 State of the Union.  *See* Pres. Biden's State of the Union Address (Feb. 7, 2023), https://www.whitehouse.gov/state-of-the-union-2023/.  Even responding to this lawsuit, the White House insisted that "nothing in the Constitution … prevents Medicare from negotiating lower drug prices."  *White House Says It Will Win Merck Lawsuit, Defends Medicare Drug Negotiations*, REUTERS (June 6, 2023).

HHS and CMS are equally committed to the charade.  *See, e.g.*, CMS, *Fact Sheet: The Inflation Reduction Act Lowers Health Care Costs for Millions of Americans* (Oct. 5, 2022).  Indeed, in its preliminary guidance in March, CMS "note[d] that entering in an Agreement" to sell at the agency-imposed MFP "is voluntary"—

---

[2] *See, e.g.*, 168 Cong. Rec. H7561-02, at 8, 24, 39 (daily ed. Aug. 12, 2022) (Reps. Torres, Jackson Lee, McGovern); 168 Cong. Rec. S4070-02, at 306, 318 (daily ed. Aug. 6, 2022) (Sens. Sanders, Casey); 168 Cong. Rec. S4070-01, at 1 (daily ed. Aug. 6, 2022) (Sen. Schumer); 167 Cong. Rec. H6375-04, at 840, 854, 863, 878 (daily ed. Nov. 18, 2021) (Reps. Yarmouth, Craig, Wasserman Schultz, Pallone).

ironically, just one sentence after reminding manufacturers they will face massive penalties for *failing* to agree.  Roth Decl. Exh. C (CMS Initial Memo) at 27.  As even the Revised Guidance makes clear, manufacturers have only three "choices"—agree to Government dictates, pay penalties potentially approaching $1 billion per day, or abandon nearly half the U.S. market and tens of millions of patients.  CMS Revised Guidance 129.  And CMS still absurdly insists that choice is "voluntary."  *Id.*

### D.    Merck Will Imminently Be Subject to the Program.

Based on Medicare spending levels, Merck's diabetes drug Januvia will be selected for "negotiations" in September 2023.  *See* Roth Decl. Exh. D, S. Dickson & I. Hernandez, *Drugs Likely Subject to Medicare Negotiation, 2026-2028*, 29 JMCP 229, 231 (Mar. 2023) (Dickson & Hernandez); Decl. of Patrick Davish (Davish Decl.) ¶ 13.  Other Merck pharmaceuticals, including another diabetes drug (Janumet) and a cancer treatment (Keytruda), are projected to be swept up in the cycles that follow.  *See* Dickson & Hernandez, *supra*, at 231–32; Davish Decl. ¶ 25, 32.

That means Merck will be forced to sign a contract agreeing to "negotiate" a "fair" price for these drugs (for Januvia, by October 1, 2023), or else trigger tens of millions of dollars of daily liability.  Davish Decl. ¶ 37.  In light of those sanctions, Merck will have no choice but to sign, even though it would not do so voluntarily.  Nor will Merck have any choice but to "accept" the dictated MFPs for its products—even though Merck vigorously denies that those innovation-stifling prices, set through this sham process, could be "fair."  *Id.* ¶ 45.  Accordingly, Merck will be forced to provide Medicare beneficiaries with "access" to its drugs at steep discounts.  *See id.* ¶ 47.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 directs that a "court shall grant summary judgment" if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). Where a case turns on the application of constitutional law to undisputed facts, it is generally appropriate for resolution on summary judgment. *See, e.g.*, *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 533, 542 (D.C. Cir. 2020). As to requests for declaratory relief, the Federal Rules contemplate "speedy" adjudication. Fed. R. Civ. P. 57.

## ARGUMENT

This Program is novel, but the constitutional principles it violates are longstanding. Foremost, if the Government wants to take private property for public use, it must *pay* for it—at fair market value. As the Supreme Court has made clear in recent years, that means the Government cannot grant union organizers "access" to real property, *see Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021); nor can it appropriate a share of a farmer's crop to facilitate market stabilization, *see Horne v. Dep't of Agric.*, 576 U.S. 351 (2015). By the same token, the Government cannot requisition prescription drugs for the benefit of Medicare beneficiaries but pay only a fraction of their fair value. It would be one thing for HHS to engage in genuine negotiations over drug pricing. And of course it is up to the Government which drug products it wants Medicare to cover. But if the Government wants to compel the transfer of private pharmaceuticals for public benefit, it must pay their full value— not unilaterally seize a massive discount for itself.

It is equally clear that the Government cannot compel businesses to convey messages against their will.  Compelled speech is a grave First Amendment harm, forcing a public betrayal of one's convictions while impairing the search for truth. Accordingly, the Supreme Court has recently held that crisis pregnancy centers cannot be forced to disseminate information contrary to their beliefs, *see NIFLA v. Becerra*, 138 S. Ct. 2361 (2018); nor can public employees be compelled to subsidize unions, *see Janus v. Am. Fed'n of State, Cnty., & Mun. Employees*, 138 S. Ct. 2448 (2018).  The Program flouts these principles too, conscripting companies to carry the Government's political water by pretending to "agree" on a "fair" price.  This theater, designed to deceive the public, strikes at the First Amendment's heart.

A hypothetical could bring the point closer to home—literally.  Imagine a mayor who seeks to solve his city's lack of affordable housing by forcing residents to rent their basement apartments to low-income individuals at below-market rates. Under this new program, a city-hall bureaucrat visits every home with a basement unit and picks a rent he decides is "fair."  The homeowner must sign a contract "agreeing" to provide "access" to that "fair" rent to any low-income person.  Anyone who declines to sign or refuses to rent is fined $1 million per day.  And the only way the homeowner can suspend that fine is to give up all rights to city water, sewer, police, fire, and trash services.  Such a scheme plainly would unconstitutionally take property and compel speech, and impermissibly hold public benefits hostage to force abandonment of those rights.  So too here.

12

## I.   THE PROGRAM TAKES PROPERTY WITHOUT JUST COMPENSATION AND THUS VIOLATES THE FIFTH AMENDMENT.

It is not hard to see how the Program effects takings without paying just compensation.  Prescription drugs are property.  Medicare beneficiaries want that property.  But the Government—which has promised to pay for their drugs—has decided that its commitment is too costly.  So it has devised a scheme to coerce manufacturers to transfer their property to Medicare beneficiaries at below-market prices.  Yet arrogating a 50% discount is no different than appropriating 50% of a manufacturer's inventory.  This Court should thus declare that the Program effects uncompensated takings under the Fifth Amendment.

### A.   The Takings Clause Forbids Governmental Appropriation of Personal Property Without Just Compensation.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const., amend. V.  This basic guarantee "bar[s] the Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  The Clause thus imposes a "simple, *per se* rule: The government must pay for what it takes."  *Cedar Point*, 141 S. Ct. at 2071.

It is settled that the Takings Clause protects *personal* property, not just *real* property.  Indeed, the Framers adopted the Takings Clause in response to abusive requisitioning of crops and other personal property during the Revolutionary War.  *See* J. Rubenfeld, *Usings*, 102 YALE L.J. 1077, 1122–23 (1993); 1 Blackstone's Commentaries, Editor's App. 305–06 (1803).

Consistent with that history, the Supreme Court has made clear the Government "has a categorical duty to pay just compensation" when it "appropriate[s] personal property." *Horne*, 576 U.S. at 358.  Such an appropriation—often called a "classic" or *per se* taking—occurs when the Government forces someone to transfer possession or title, whether to "itself or someone else." *Cedar Point*, 141 S. Ct. at 2072.  Either way, the owner loses the "rights to possess, use and dispose of" his property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982); *see also Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Protection*, 560 U.S. 702, 713 (2010) (plurality op.) (explaining that a "classic taking is a transfer of property to the [government] or to another private party").

The Court's recent decision in *Horne* illustrates classic takings in the personal property context.  There, a statute directed farmers to "turn over a percentage of their raisin crop without charge," under pain of penalties, subject to the right to recover some proceeds if the Government resold the raisins.  576 U.S. at 361–62.  The Court reiterated the "categorical duty to pay just compensation" whenever the Government "appropriate[s] personal property." *Id.* at 358.  And because the statute caused title to the raisins to pass from the farmers, the Court reasoned, a taking occurred. *Id.* at 361.  In doing so, the Court rejected the argument that the potential proceeds from the Government's resales excused the taking. *Id.* at 363.  Any payments would be relevant only to the remedial question of what compensation was due; they would not change that the raisins were appropriated in the first instance. *Id.* at 364.

For the same reason, dressing up an appropriation as a "sale" does not change the analysis.  For takings purposes, it does not matter how an appropriation "comes garbed." *Cedar Point*, 141 S. Ct. at 2072.  If the Government uses legal sanctions to compel a "sale" from A to B, a taking has occurred; the only question is whether the dictated price satisfies just compensation.  The Supreme Court has long recognized this logic in the context of public utilities.  *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307–08 (1989).  "Because utilities generally are compelled to employ their property to provide services to the public, the Fifth Amendment requires" rates that amount to just compensation.  *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993).  And for personal property, "'just compensation'" usually means "'the market value of the property at the time of the taking.'"  *Horne*, 576 U.S. at 368–69.  Only that remedy puts the owner "in the same position monetarily as he would have occupied if his property had not been taken."  *United States v. Reynolds*, 397 U.S. 14, 16 (1970).

Importantly, forced transfers are distinct from price caps—which *forbid* sales on certain terms but do not *compel* sales on any terms.  For example, a rent-control law that does not "compel[]" owners "to continue" renting would not be a taking, since the owner has a "voluntar[y]" choice about how to *use* the property.  *Yee v. City of Escondido*, 503 U.S. 519, 527–28 (1992); *see also Bowles v. Willingham*, 321 U.S. 503, 517 (1944) (rent-control law had "no requirement that the apartments … be used for the purposes which bring them under the Act").  By contrast, a forced sale leaves its owner with no choice—and no property.  That distinction—"between appropriation and regulation"—makes all the difference.  *Horne*, 576 U.S. at 362.

**B.    The Program Appropriates Private Property Without Paying Just Compensation.**

The Program will requisition for public use the private property of the drug manufacturers: their patented pharmaceuticals.  And, by design, it will do so without paying just compensation, instead paying only a *fraction* of a benchmark market price.  This is a transparent violation of the Takings Clause.

**1.**    To start, there is no doubt that patented drugs like Merck's Januvia, Janumet, and Keytruda fully qualify as "property" protected by the Takings Clause.  Those drugs are personal property—just like raisins, cars, and removable building fixtures.  *See Horne*, 576 U.S. at 358; *United States v. General Motors*, 323 U.S. 373, 383–84 (1945).

If anything, pharmaceuticals are doubly protected because they are also *patented*.  A patent "confer[s] upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation."  *Horne*, 576 U.S. at 359 (quoting *James v. Campbell*, 104 U.S. 356, 358 (1882)); *see also Hartford-Empire Co. v. United States*, 323 U.S. 386, 415 (1945) ("That a patent is property, protected against appropriation by both individuals and by government, has long been settled.").  Indeed, that is why Medicare could not just produce its own prescription drugs for its beneficiaries; it must instead procure them from the manufacturers who hold the patents.

**2.**    The IRA's unique scheme of compelled "sales" will effect a classic taking of the manufacturers' personal property.

Under the Program, once HHS selects a drug for inclusion, its manufacturer is coerced by the threat of enormous penalties to "agree" to "negotiate" a price for the drug, and ultimately to "accept" the agency's final MFP.  *See* 26 U.S.C. § 5000D (penalty for failure to agree to negotiate or to the MFP).  Thereafter, under the IRA and these coerced "agreements," the manufacturer must provide "access" to its drug at the MFP to Medicare beneficiaries and those who buy drugs on their behalf.  42 U.S.C. § 1320f–2(a)(3).  That "access" requirement means that the manufacturer must transfer its products to those third parties at the dictated price—it cannot refuse to sell to them on those terms.  That mandated "access" to the drug "requires physical surrender of the [drugs] and transfer of title," and the manufacturers "lose any right to control their disposition."  *Horne*, 576 U.S. at 364.  That makes this a classic, *per se* taking.  *See id.* at 362; *Cedar Point*, 141 S. Ct. at 2072.

Unlike a price cap, the Program does not just forbid companies to charge above the MFP if they "voluntarily" choose "to continue" selling to Medicare beneficiaries. *Yee*, 503 U.S. at 527–28.  Nor does it merely set maximum prices Medicare will *pay* for drugs.  Those schemes may have been "regulation," not "appropriation," *Horne*, 576 U.S. at 362—but would have left the Administration exposed to political backlash if no deal was reached and drugs became unavailable through Medicare.  To avoid that risk, the Program *mandates* "access."  *Cf. Cedar Point*, 141 S. Ct. at 2072 (holding that law granting union "access" to property was *per se* taking).  Because the IRA "compel[s] [manufacturers] to employ their property to provide [drugs] to the public," it triggers the duty to pay just compensation.  *Garelick*, 987 F.2d at 916.

The fact that the Program mandates these transfers through an "agreement" does not change the analysis, because the "agreement" is compelled by draconian penalties.  Penalties are, of course, a form of legal compulsion.  *See, e.g.*, *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943) (holding that taxes "for the enjoyment of a right granted by the Federal Constitution" are "a restriction of the free exercise of those freedoms"); *Eastern Enters. v. Apfel*, 524 U.S. 498, 529 (1998) (finding that Coal Act effected taking where it used "severe penalty" to coerce monetary exactions); *Horne*, 576 U.S. at 356 (demand for raisins enforced through penalties was a taking).  Indeed, if the Takings Clause could be circumvented by using penalties to coerce owners to "agree" to forfeit their property, it would be utterly toothless.

**3.**    Because the Program effects a taking, the Government must pay just compensation: "fair market value."  *Reynolds*, 397 U.S. at 16.  But the IRA is designed to ensure that Medicare does *not* pay fair market value.  Indeed, the law imposes a ceiling price that, by definition, can be no greater than 40% to 75% of the average price paid by non-federal purchasers in the market.  42 U.S.C. § 1320f–3(b)(2)(F), (c)(1)(C).  And HHS is free to demand even steeper discounts, with no prospect of judicial review.  *Id.* § 1320f–7.  The Program is thus designed to mandate prices with no relationship to fair market value.  As a matter of law, this is not just compensation.  *See Horne*, 576 U.S. at 368–69; *cf. General Motors*, 323 U.S. at 385 (Douglas, J., concurring in part) (finding it "difficult to see" how "allow[ing] the Government to oust a person from a portion of his leasehold, occupy the premises, but pay only a part of the rent," as opposed to "full" value, would provide just compensation).

And while the prescription drug market is notoriously complex, this case does not require computing the fair market value of any particular drug. That is a remedial question beyond the scope of this facial challenge. *See Horne*, 576 U.S. at 364 (distinguishing these two questions). In this action, Merck seeks only declaratory relief on its takings claim; because Merck does not seek damages for the Program's takings, there is no need to calculate precise market value—only to recognize the self-evident point that the statute does not provide for anything resembling it.

Ultimately, the Supreme Court's decision in *Horne* controls this case. The statute there, like the IRA, used penalties to coerce owners to turn over property (there, raisins; here, prescription drugs), sacrificing possession and title. *See* 576 U.S. at 362. As a result, in both cases the Government has "a categorical duty to pay just compensation." *Id.* at 358. The statute in *Horne* appropriated a percentage of a farmer's *crop*, whereas the Program here appropriates a manufacturer's drugs for a percentage of their *value*—but there is no meaningful distinction between those seizures. Appropriating 50% of one's inventory is materially identical, economically and legally, to requisitioning that inventory at a 50% discount. Medicare's partial payments are thus relevant only to the calculation of damages, just like the partial proceeds that the farmers stood to gain from the resale of their raisins. *See id.* at 364. In neither case do those partial payments vitiate the existence of a taking in the first place. *See id.* This case is thus controlled by a "simple" rule: "The government must pay for what it takes." *Cedar Point*, 141 S. Ct. at 2071.

### C.     Declaratory Relief Is Appropriate and Warranted.

The Court should declare that the Program effects takings without providing just compensation.  The Declaratory Judgment Act permits declaratory relief when "appropriate."  28 U.S.C. § 2201.  Unlike litigants seeking an injunction, those seeking declaratory relief need not show irreparable injury.  *See Steffel v. Thompson*, 415 U.S. 452, 463 (1974).  Rather, relief is appropriate if a declaration would "finally settle the controversy between the parties"; promote "the convenience of the parties," especially relative to "other remedies" that may be available; and if the question is one of "public importance."  *Jackson v. Culinary Sch. of Washington, Ltd.,* 27 F.3d 573, 580 (D.C. Cir. 1994).  All of those criteria are readily met here.

*First*, a declaration would resolve the uncertainty over the Program's legality and, more specifically, whether it will trigger the Government's obligation to pay monetary compensation for its below-market seizures.  The Supreme Court has long recognized that parties may seek declaratory relief against threatened statutory takings if the law does not provide "advance assurance of adequate compensation in the event of a taking."  *Duke Power Co. v. Carolina Envt'l Study Grp.*, 438 U.S. 59, 71 n.15 (1978); *cf. Horne*, 576 U.S. at 367–68 (holding that farmers did not have to pay penalty, "then seek compensation").  The IRA is a perfect example: It contemplates takings of property but suggests manufacturers will receive only partial payments.  Because the IRA therefore offers no "advance assurance of adequate compensation," declaratory relief is appropriate.  *Duke Power*, 438 U.S. at 71 n.15.

*Second*, declaratory relief would promote convenience of the parties, especially relative to an after-the-fact suit for compensation.  Importantly, this dispute concerns whether the IRA effects compensable takings *at all*.  Leaving that issue unresolved until after forced sales begin in 2026 creates untenable uncertainty: Merck needs to know well in advance, as it plans its research and development, how the Program will impact those ventures.  *See* Davish Decl. ¶¶ 53–57.  For the Government, too, it is better to know now whether lower MFPs are simply going to boomerang back in the form of eventual compensatory awards in the Court of Federal Claims.

Again, Supreme Court authority is instructive.  In *Eastern Enterprises*, the Court considered the Coal Act, which required contributions to a miners' benefit fund.  524 U.S. at 530.  A controlling plurality reasoned that deferring the takings issue until after-the-fact suits for damages would be "utterly pointless" given that "every dollar paid" into the fund would "generate a dollar of … compensation" later.  *Id.* at 521.  Since "Congress could not have contemplated" that circularity, declaratory relief was "appropriate."  *Id.* at 521–22.  Likewise, leaving Merck to seek *ex post* monetary relief—a dollar of damages for every dollar of discounts HHS snatches now—would be "utterly pointless," something "Congress could not have contemplated."  *Id.*

*Finally*, the parties' controversy is obviously extremely important as a policy matter, and a declaration would serve the public interest by clarifying the legality of the Program and the viability of the IRA's plan to cut Medicare's drug spending.  If the Program violates the Fifth Amendment, Congress should be informed sooner than later so that it can consider constitutionally legitimate alternatives.

For all these reasons, declaratory relief is eminently appropriate here, both as a matter of common sense and under the D.C. Circuit's prudential factors.  *See* T. Merrill, *Anticipatory Remedies for Takings*, 128 HARV. L. REV. 1630, 1666–74 (2015) (explaining why declaratory relief is appropriate in takings cases where dispute is whether taking occurred, as opposed to amount of compensation).  This Court should therefore declare that the Program's forced sales effect compensable takings.

II.     **THE PROGRAM COMPELS MANUFACTURERS TO ENDORSE POLITICAL MESSAGES AND THUS VIOLATES THE FIRST AMENDMENT.**

Aside from its infringement on drug manufacturers' *property* rights, the Program violates their *speech* rights by conscripting them to engage in performative "negotiations" and sign Soviet-style "agreements" to help the Government obscure the reality of this new regime.  That is, even assuming the Government could compel manufacturers to sell their drugs at a discount, Congress could have engineered that economic objective far more directly by authorizing HHS to impose prices for covered drugs and mandating that manufacturers provide "access" to Medicare beneficiaries at those prices.  Instead, Congress laundered these mandates through "agreements" that companies must enter on pain of enormous penalties.  The sole apparent purpose of that roundabout regulation is to make it appear as if the manufacturers have *acknowledged*, through voluntary "negotiation," that HHS's prices are "fair," thereby boosting the Government's political narrative.  But, under the First Amendment, a company cannot be dragooned into service as a political mouthpiece.  The Program's scheme of coerced "agreements" is designed to do exactly that.  This Court should therefore enjoin the Government from enforcing it.

### A.    The First Amendment Forbids the Government To Conscript Others To Convey Its Political Messages.

"[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796–97 (1988).  The Government thus can neither "prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Knox v. SEIU*, 567 U.S. 298, 309 (2012).  The latter is the foundation of the compelled speech doctrine: The Government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995).  The Supreme Court reiterated just this past Term that the Government cannot "force" a person to engage in "speech she does not believe or endorse." *303 Creative LLC v. Elenis*, No. 21-476, 2023 WL 4277208, at *6 (U.S. June 30, 2023).

That doctrine serves at least two crucial purposes.  *First*, it protects citizens from being forced to betray their convictions.  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).  Indeed, its "very purpose … is to foreclose public authority from assuming a guardianship of the public mind." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring); *accord Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  When the Government compels a person to spread a message he rejects, it "invades the sphere of intellect and spirit" that must lie beyond "official control." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Such coercion is anathema to a "political system" built on free expression, *Turner*, 512 U.S. at 641, in which all enjoy the "right to present their message undiluted by views they d[o] not share," *303 Creative*, 2023 WL 4277208, at *7.

*Second*, the compelled speech doctrine ensures an "open marketplace in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference." *Knox*, 567 U.S. at 309. "[F]reedom of thought and speech is 'indispensable to the discovery and spread of political truth.'" *303 Creative*, 2023 WL 4277208, at *7. But when Congress "requires the utterance of a particular message favored by the Government," it "manipulate[s] the public debate through coercion rather than persuasion." *Turner*, 512 U.S. at 641. This corrupts "the processes through which political discourse or public opinion is formed." *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 49 (2017) (Breyer, J., concurring). To prevent that distortion, the Supreme Court has held that no speaker can be forced to feign "agree[ment] with the Government's polic[ies]." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).

Compelled speech doctrine equally protects businesses. "For corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 16 (1986) (plurality op.). And letting the Government commandeer the voices of businesses to parrot one side of a debate short-circuits the truth-seeking process that the First Amendment is designed to safeguard. The Government thus cannot make a company, any more than an individual, a "vehicle for spreading a message with which it disagrees." *Id.* at 17; *see,*

*e.g.*, *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001) (mushroom growers could not be forced to promote the general sale of all mushrooms).  After all, "the First Amendment extends to all persons … including those who seek profit," and speakers do not "shed their First Amendment protections by employing the corporate form." *303 Creative*, 2023 WL 4277208, at *12, 15.  Thus, the Government may not "compel speakers"—regardless of their identity—"to utter or distribute speech bearing a particular message." *Turner*, 512 U.S. at 642.

If a statute does mandate speech, courts subject it to heightened scrutiny. "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those that "suppress" speech based on its content—*i.e.*, strict scrutiny.  *See id.*; *see also Riley*, 487 U.S. at 797–98, 800.  Under that standard, the challenged law must be "narrowly tailored" to achieve a "compelling" government interest.  *Pac. Gas*, 475 U.S. at 19 (plurality op.).  In cases involving some purely factual and uncontroversial commercial disclosures, the Supreme Court has endorsed a slightly relaxed level of scrutiny.  *See, e.g.*, *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985); *see also NIFLA*, 138 S. Ct. at 2372, 2377–78.  Even under that intermediate standard, however, the government interest must be "substantial" and the challenged provision must be "drawn to achieve" it.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 34 (D.C. Cir. 2014) (en banc) (Kavanaugh, J., concurring) (observing that this "stringent" test "tightly limits mandatory disclosures to a very narrow class").

**B.      The Program Forces Manufacturers To Express "Agreement"
with HHS's Prices and To Endorse Their "Fairness."**

The Program violates the First Amendment by forcing manufacturers to peddle
the Government's messages on pain of astronomical penalties.  Specifically, the
Program compels manufacturers to sign on the dotted line—literally—and thereby to
convey their public "agreement" to HHS's negotiations and to the "fairness" of HHS's
price.  The sole purpose of forcing manufacturers to "agree" to those mandates—as
opposed to just imposing them directly—is to construct a charade of consensus.  But
deceiving the public for political gain is a fundamentally illegitimate goal.

1.      The Government cannot "coerc[e]" speech using "threat of punishment,"
including "monetary fines." *303 Creative*, 2023 WL 4277208, at *9.  That is what this
Program does: compel expression by punishing those who refuse to "agree" with HHS.
*First*, manufacturers must "enter into" an "agreement" with HHS, 42 U.S.C. § 1320f–
2(a), pledging to "negotiate" toward a "maximum fair price" for its drugs, Template
Agreement at 1.  CMS will publicize that "agreement."  *See* CMS Revised Guidance
120.  *Second*, at the culmination of the "negotiation," the manufacturers must "agree
to" whatever final "fair price" HHS offers, 42 U.S.C. § 1320f–2(a)(1), by executing a
"Negotiated Maximum Fair Price Addendum," Template Agreement at 7.   The
substance of that "agreement," too, will be published for public consumption.  *See* 42
U.S.C. § 1320f–4(a); CMS Revised Guidance 162–63.  Yet both "agreements" are
legally coerced by threat of sanctions.  If the manufacturer does *not* enter them by
the statutory deadlines, every subsequent day counts as a "noncompliance" period
and triggers an enormous penalty.  26 U.S.C. § 5000D.

By signing the agreements, a manufacturer necessarily communicates several messages to the public: (1) its willingness to enter *bona fide* negotiations; (2) that voluntary negotiations will culminate in an agreed price; and (3) that the final HHS price is "fair." The Template Agreement released by CMS makes all that abundantly clear. It is entitled "Medicare Drug Price Negotiation Agreement," at once conveying both that the manufacturer is participating in a "negotiation" and that the parties reached an "agreement." Template Agreement at 1. Its opening clauses then recite that the parties will "negotiate to determine a price," and that the manufacturer contemplates reaching "agreement with CMS." *Id.* The contract goes on to use the terms "agree," "agreement," and "maximum fair price" literally dozens of times across a mere five pages. *See id.* at 1–5. The Addendum, too, is styled as a "Negotiated Maximum Fair Price Addendum," signaling that the parties "negotiated" to a price they agree is the "maximum fair" one, and repeats that the parties indeed "engaged in negotiation" and "agree" to the HHS-dictated price. *Id.* at 7.

Yet Merck does *not* "agree" that the Program involves true "negotiation"; by design, Merck will have zero leverage in these sham proceedings. Nor does Merck "agree" that its participation in the Program is voluntary; instead, its participation will be coerced by the threat of massive penalties. Most importantly, Merck rejects the view, embedded in the "agreements," that HHS's dictated-and-discounted price will be the "maximum fair price" for its products. Merck instead believes that HHS's discounted prices will harm the public by undermining and skewing the incentives for development of new life-saving drugs. *See* Davish Decl. ¶ 38.

27

Recognizing the First Amendment harms, CMS has recently tried to mitigate them through a disingenuous disclaimer: one that claims the agreement does not reflect an "endorsement of CMS' views" and that signing on the dotted line should not be taken as agreement that "fair" means "fair" in the "colloquial" sense.  Template Agreement at 4.  In other words, the agreement should not be understood to mean what it would plainly mean to any ordinary reader.  Rather, Merck is supposedly only agreeing on a "maximum fair price" as those words are "specified in the statute." *Id.*

The need to add that disclaimer only confirms that the contract *does* suggest an endorsement of CMS's views and imply the "colloquial meaning" of "fair." *Id.*  The disclaimer is thus ineffective, as it purports to deny what the rest of the contract clearly says.  In any event, adding a "disclaimer … does not suffice" to cure the First Amendment problem, because the Government cannot "require speakers to affirm in one breath that which they deny in the next." *Pac. Gas*, 475 U.S. at 15 n.11 & 16 (plurality op.).  The Government could not compel students to salute the flag so long as they incant afterwards that "this salute should not be misunderstood as a symbol of patriotism." *Cf. Barnette*, 319 U.S. at 642.  It could not force drivers to display a "Live Free or Die" license plate so long as fine print clarifies "this motto does not reflect the views of the driver." *Cf. Wooley*, 430 U.S. at 714; *id.* at 722 (Rehnquist, J., dissenting) (arguing that drivers could "disavow the motto" through a "conspicuous bumper sticker").  And it could not compel public employees to subsidize unions simply by pronouncing that such fees are not to be understood as an "endorsement" of the union's views. *Cf. Knox*, 567 U.S. at 309.

In all those cases, the compelled speech unavoidably conveyed a message, and the Government would not be free to compel that message merely by purporting to deny it or by allowing the speaker to disassociate from it. "So too would a disclaimer here be inadequate." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 (8th Cir. 2019). By forcing manufacturers to sign agreements committing to "negotiate," purporting to "agree," and conveying that HHS's prices are the "maximum fair" ones, the IRA compels the manufacturers to speak and to acquiesce in views they dispute. Based on those agreements, the Administration will be able to continue to mislead the public about the Program. To be sure, thanks to CMS's (post-lawsuit) tweak, manufacturers are now able to issue responsive press releases citing technical terms in subsection IV(f) of the "Medicare Drug Price Negotiation Agreement." But that is cold comfort—and constitutionally irrelevant. By then, the First Amendment harm will already have been done: Merck's "own message" will have been "affected by the speech it was forced to accommodate." *Rumsfeld v. FAIR*, 547 U.S. 47, 63 (2006); *see also Circle Sch. v. Pappert*, 381 F.3d 172, 182 (3d Cir. 2004) (reiterating that "general disclaimer … does not erase the First Amendment infringement" because "the schools are still compelled to speak the Commonwealth's message").

Of course, many ordinary contracts do not express views or convey beliefs—they are promises to act, not professions of principle. But some transactions can be expressive, as any boycotter knows. In *New Hope Family Services, Inc. v. Poole*, for example, the Second Circuit recognized that forcing an adoption agency to "approve an adoption" for a same-sex couple could convey the message that the agency believes

that placement promotes "the best interests of the child"—a view "with which [the agency] does not agree." 966 F.3d 145, 177–78 (2d Cir. 2020). Here, the problem is even clearer than in *New Hope*, because the IRA forces the manufacturer not merely to *transact* (and thus *imply* agreement), but actually to "*agree*" in writing to the Program's core, disputed value judgment—that HHS's below-market dictated price is "fair," and indeed the "maximum fair price."

And, importantly, the misimpression of manufacturer endorsement is not a *bug* in the Program, but rather a primary *feature*. Again, it would have been easy enough for Congress to authorize HHS to set maximum prices for covered drugs, as Congress has long done in rate-setting contexts. And Congress could have directly ordered manufacturers to provide "access" at those prices (although that would have been a taking for the reasons explained above). Yet, instead, the IRA obscures the agency's price-setting and forced sales by running everything through the façade of "agreements," to make it appear to be the product of voluntary negotiation rather than top-down control. The goal is to fabricate the image of a "fair" process—like when a regime forces political prisoners to accept responsibility at show trials before they are shipped to the gulag. "Look—even they agree this is fair!"

In sum, "the 'very purpose'" of the IRA's sham negotiation process is "to force" a manufacturer "to convey a message [it] does not believe." *303 Creative*, 2023 WL 4277208, at *13. It thus goes far beyond what is "typical" for economic regulation, by "regulating the *communication* of prices rather than prices themselves." *Expressions Hair*, 581 U.S. at 47–48 (emphasis added). That offends the First Amendment.

**2.** By coercing manufacturers to express the Government's message, the Program also violates both bedrock purposes of the compelled speech doctrine.

*First*, by forcing manufacturers to "agree" with HHS on a "fair price," the IRA compels businesses to parrot political messages inimical to their own views. Again, Merck does not "agree" that forced sales at innovation-stifling discounted prices are "fair" to anyone—including patients. Nor does it believe prices negotiated *without* HHS intervention are *unfair*. To the contrary, Merck understands that its products must be priced to incentivize and support the incredibly costly process of researching, developing, and securing FDA approval for life-saving medicines, especially given that most of those enormous investments never result in marketable (let alone profitable) products. *See* Davish Decl. ¶¶ 38, 45, 53.

Nevertheless, the Program forces Merck to peddle the counternarrative: that, absent the IRA's "negotiations," Merck would charge *more* than the "maximum fair price." Such coercion is antithetical to the First Amendment, under which businesses cannot be "made into involuntary solicitors for their ide[o]logical opponents." *Cent. Illinois Light Co. v. Citizens Util. Bd.*, 827 F.2d 1169, 1173 (7th Cir. 1987); *see also Pac. Gas*, 475 U.S. at 16 (plurality op.). This forced self-abnegation betrays the First Amendment's basic guarantee of "freedom of mind." *Wooley*, 430 U.S. at 714. After all, "Thomas More went to the scaffold rather than sign a little paper for the King." *E. Texas Baptist Univ. v. Burwell*, 807 F.3d 630, 635 (5th Cir. 2015) (Jones, J., dissenting from denial of rehearing en banc).

31

*Second*, the IRA's contrived "negotiated agreements" distort public debate.  By forcing its targets to portray themselves as willing participants, the IRA intensifies— and insulates from criticism—the position that HHS's prices are "fair" and have been "agree[d] to" by all involved.  42 U.S.C. § 1320f–2(a)(1).  Although the Government is entitled to persuade the public that prices would be "unfair" if not for the IRA, it cannot compel companies to feign agreement.

CMS exposed the Government's speech-distorting objectives when, in its initial guidance document, it announced a gag order over the "negotiations": Manufacturers would be forbidden (by "agreement," of course) to "disclose to the public" anything about the back-and-forth, the HHS ceiling price, the agency's justification for its offers, or "any information exchanged verbally."  CMS Initial Memo 30.  That gag order highlighted the statute's violation of the First Amendment, by confirming the Government's goal of limiting the information in the public domain to the misleading "agreements."

Confronted with a wave of lawsuits, CMS backtracked; it now says companies "may choose to publicly disclose information regarding its ongoing negotiations."  CMS Revised Guidance 124.  Still, relaxing the gag order does not cure the compelled speech problem, any more than a contractual disclaimer does.  *See supra* at pp. 28-29.  By forcing manufacturers to combat the misimpression of acquiescence, the IRA burdens their participation in the marketplace of ideas.  "That kind of forced response is antithetical to the free discussion that the First Amendment seeks to foster."  *Pac. Gas*, 475 U.S. at 16 (plurality op.).

**3.**     Because the IRA "compel[s]" manufacturers "to express certain views," it merits strict scrutiny. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1211 (D.C. Cir. 2012). But the IRA cannot survive *any* heightened scrutiny. Its speech burdens do not advance any legitimate (much less substantial or compelling) interest. They serve only to deceive the public in furtherance of a political agenda.

Setting aside the Takings Clause problem, Congress could have achieved the IRA's economic aims by simply empowering HHS to impose prices for covered drugs. There was no need for performative "negotiations" or "agreements." Enlisting manufacturers in the Government's deceptive messaging campaign does nothing to reduce drug prices, foster innovation, or guard the public fisc. But what it *does* add is cover at the polls. Evidently, Congress saw political benefit to concealing top-down price controls and mandates—interventions often associated with rationing and shortages in centrally planned economies. Indeed, one recent poll found widespread support for allowing Medicare to *negotiate* drug prices—but support plummeted by over 30% when respondents were asked about a regime that "effectively allow[s] the federal government to set the prices of drugs." *See* National Tracking Poll, Morning Consult at 13, 17 (Sept. 2021). Obscuring the IRA's price-setting mandates beneath a conceit of "agreements" thus made it easier to force this Program through a closely-divided Senate and to sell it to the American people.

That may be a good *political explanation*, but it is hardly a *legal justification*. Indeed, if political deception could justify forced expression, the First Amendment would be meaningless. The Program plainly fails heightened scrutiny.

## C.     Injunctive Relief Is Appropriate and Warranted.

The proper remedy for the Program's unconstitutional compelled speech is an injunction.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.).  As a result, injunctive relief is warranted whenever "First Amendment interests [are] either threatened or in fact being impaired."  *Id.*

The equities and public interest point in the same direction.  The Government has no legitimate justification for forcing speech.  But the public has everything to lose from the systematic manipulation of the marketplace of ideas.  This is why the Supreme Court regularly upholds injunctive relief in compelled speech cases.  *See, e.g.*, *NIFLA*, 138 S. Ct. at 2370 (reversing denial of preliminary injunction); *Riley*, 487 U.S. at 787, 803 (affirming grant of injunctive relief); *Wooley*, 430 U.S. at 712, 717 (same).

Accordingly, this Court should declare that the Program's requirements to "agree" to negotiate and to accept "maximum fair prices" are unconstitutional, and enjoin their enforcement.  In particular, it should enjoin Defendants from forcing Merck to sign an initial "manufacturer agreement," 42 U.S.C. § 1320f–2(a), and to "agree to" the "maximum fair price" developed through the Program, *see id.* § 1320f– 2(a)(1), (a)(2).  And if the timing of the Court's adjudication is such that Merck has *already* been compelled to enter one or both of those agreements, the Court should declare those agreements void and enjoin Defendants from enforcing their terms.

**III.     MERCK DID NOT VOLUNTARILY SUBMIT TO THE PROGRAM'S DEMANDS BY PARTICIPATING IN MEDICARE AND MEDICAID.**

The Program's constitutional offenses cannot be excused by pretending Merck voluntarily submitted to the IRA's demands—and thus forfeited its constitutional rights—by accepting Medicare or Medicaid coverage for its products.  That theory is wrong on multiple levels.  There is nothing "voluntary" about being told that you can "choose" between complying with Government orders on pain of enormous penalties, or committing economic suicide by permanently cutting off almost half of all patients who rely on your products.  That is a quintessential unconstitutional condition.

Of course, the Government can use its authority under the Spending Clause, *see* U.S. Const. Art. I, § 8, to attach certain conditions to public benefits, including Medicare payments.  But the "conditions" framing is not a blank check, and it cannot rescue the Program's intrusion on property and speech rights here.

At the outset, the Program does not take the form of a typical "condition" at all.  When Congress puts conditions on federal funds, it explicitly ties its demands to receipt of the funds.  *E.g.*, 42 U.S.C. § 2000d (prohibiting race discrimination in any "program or activity receiving Federal financial assistance"); 29 U.S.C. § 794(a) (same for disability discrimination); 42 U.S.C. § 300a–6 ("None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.").  These statutes employ conditional language of contracts, not mandatory language of regulation.  *See Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1570 (2022) (contrasting "ordinary legislation," which imposes "involuntar[y]" mandates, and "Spending Clause legislation," which "operates based on consent").

By contrast, nothing in the IRA expressly limits the Program's demands to current recipients of federal funds; it applies to manufacturers of any drugs that HHS selects. *See* 42 U.S.C. § 1320f(a). Nor does the IRA suggest the manufacturers have any option. Its obligations are phrased as actions that a manufacturer "shall" take. *See, e.g.*, *id.* § 1320f–3(a) (manufacturer "*shall* … negotiate a maximum fair price"); *id.* § 1320f–2(a)(3) ("access to the maximum fair price … *shall be* provided") (emphases added). Of course, it is "generally clear that 'shall' imposes a mandatory duty." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016). And, proving the point, the Program enforces compliance not by withholding Medicare reimbursements (as in other Medicare provisions, *e.g.*, 42 U.S.C. § 1396r–8(a)), but by levying vast penalties for every day of "noncompliance." 26 U.S.C. § 5000D.

Indeed, a manufacturer's relationship with Medicare and Medicaid only enters the equation on the back end: The IRA "suspends" its penalty for days when "none of the drugs of the manufacturer" are covered by agreements that are prerequisites to coverage. *Id.* § 5000D(c)(1). In other words, to avoid the Program's mandates and penalties, a manufacturer must wholesale abandon its access to nearly half of the U.S. prescription drug market, implicating tens of millions of patients.

In any case, characterizing that as a "condition" cannot save the Program. It is common for the Government to try to justify constitutional violations by framing them as "conditions." It tried that in *Horne*, arguing that the raisin appropriation amounted to a "condition" on "a Government benefit," and that farmers could avoid the raisin appropriations simply "by 'planting different crops.'" 576 U.S. at 357. It

tried again in *Cedar Point*, arguing that the Government may "require property owners to cede a right of access as a condition of receiving certain benefits." 141 S. Ct. at 2079. Likewise, it defended the speech compulsion in *Agency for International Development* as "a condition on the receipt of federal funds." 570 U.S. at 213. In all of those cases, however, the Supreme Court rejected the defense. *See Horne*, 576 U.S. at 366 (denying that raisin appropriation can "reasonably be characterized as part of a … voluntary exchange"); *Cedar Point*, 141 S. Ct. at 2080 (holding that union access rule was not "germane" to any public benefit); *Agency for Int'l Dev.*, 570 U.S. at 218–19 (condition cannot be used to require "recipients to profess a specific belief"). Here too, the IRA's "offer"—do what the Government says, or lose access to half of your market—is unconstitutional under at least two lines of Supreme Court precedent.

## A.   The IRA's "Choice" Is Coercive, Not Voluntary.

The Spending Clause is among the Federal Government's most consequential powers. Each year, it provides trillions of dollars to both public and private entities. *See Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 674 (2012) (joint dissent). Congress "customarily attaches conditions" to the receipt of those payments, *id.* at 675, which gives the Government some leeway to regulate where it would otherwise lack Article I authority. *See, e.g.*, *United States v. Butler*, 297 U.S. 1, 66 (1936). This is a context where the greater power cannot include the lesser power, however—just because the Government need not provide a benefit does not mean it may hinge the benefit on a recipient's waiver of constitutional rights. Otherwise, the Spending Clause would swallow the rest of the Constitution.

To avoid that self-defeating notion, the Supreme Court has long made clear that Spending Clause regulation is legitimate only because—and only when—the recipients of the federal funds "voluntarily … accept" Congress's "terms." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because such regulation is akin to "a contract," its terms must be "voluntarily" accepted. *Cummings*, 142 S. Ct. at 1570. In short, this is regulation by *consent*—but when "persuasion gives way to coercion," Congress's authority runs out. *NFIB*, 567 U.S. at 585. As such, conditional regulation is permissible only if Congress offers a *genuine* choice that a recipient can *voluntarily* accept—not merely a choice "between the rock and the whirlpool." *Frost & Frost Trucking Co. v. R.R. Comm'n*, 271 U.S. 583, 593 (1926). The choice cannot be "illusory," *Butler*, 297 U.S. at 71, and must exist "not merely in theory but in fact," *NFIB*, 567 U.S. at 581. The IRA readily fails that standard.

1.     The Supreme Court recently held that a federal funding condition was unconstitutionally coercive in circumstances that closely parallel this case. In *NFIB*, the Court ruled that Congress could not force a State to expand Medicaid coverage by "threatening to withhold all of [its] Medicaid grants." 567 U.S. at 575. *NFIB* cited three features of that condition that rendered it unconstitutional.

*First*, instead of merely withholding "*new* funds" from States that do not accept those "new conditions," *id.* at 579, Congress "threaten[ed] to withhold … *existing* Medicaid funds," which was a signal that the Government was using its power over those existing benefits as a "means of pressuring" recipients. *Id.* at 575–76, 580 (emphasis added). *Second*, that pressure was unconstitutionally coercive—a "gun to

the head"—by virtue of its sheer size: It threatened about 10% of a State's budget. *Id.* at 581–82.   *Third*, by imposing on the Medicaid bargain "post-acceptance retroactive conditions" that States "could hardly [have] anticipate[d]," Congress upended reliance interests that had developed after "many decades" of integration with Medicaid's structure and funding stream.  *Id.* at 581, 583–84.

In short, the Affordable Care Act attempted to leverage large, pre-existing funding streams on which States had relied and which they could not afford to lose, to pressure States to take additional actions beyond the scope of the original Medicaid bargain.  The Court squarely rejected that maneuver.  Even though Congress was under no obligation to maintain the Medicaid program, it could not use that leverage to coerce States to abandon their Tenth Amendment rights.

Insofar as the IRA conditions Medicare and Medicaid coverage on submission to the Program, it parallels *NFIB* to a tee.  *First*, just as Congress targeted *all* of a State's *existing* Medicaid funding to induce agreement to *new* conditions, the IRA targets *existing* coverage for *all* of a manufacturer's drugs on its abandonment of rights regarding *one* distinct product.  In other words, rather than withhold payments for a particular drug absent agreement on *that drug's* price, Congress "threaten[ed] to terminate other significant independent grants."  *Id.* at 580.  That is "properly viewed as a means of pressuring" companies to hand over property and propagate a political agenda.  *Id.*  And, as in *NFIB*, the fact that Congress "'styled'" the IRA's Program as *part* of Medicare cannot obscure its leveraging of a longstanding funding source to coerce compliance with a radical new program.  *Id.* at 582.

*Second*, if Congress's threat to cut off 10% of a State's budget was a "gun to the head," *id.* at 581, the IRA aims a veritable bazooka at the American pharmaceutical industry by threatening access to half of the prescription drug market. *See Sanofi Aventis*, 58 F.4th at 699 (noting that Government "pays for almost half the annual nationwide spending on prescription drugs"). Congress knew it would be economic suicide for any manufacturer to withdraw from these programs. That renders any "asserted power of choice … illusory." *Butler*, 297 U.S. at 71. The IRA's choice is "between the rock and the whirlpool," *Frost*, 271 U.S. at 593, and upholding it would flout the Court's insistence that funding recipients are entitled to a choice "not merely in theory but in fact," *NFIB*, 567 U.S. at 581.

*Third*, just as the Affordable Care Act "surpris[ed]" States by imposing new, "post-acceptance conditions" that "transformed" the nature of the Medicaid program they had entered "decades" earlier, *NFIB*, 567 U.S. at 581, 583–84, the IRA executes a bait-and-switch on drug manufacturers. Indeed, the IRA's ambush is even more egregious than the one rejected in *NFIB*. While Congress had expressly warned from the outset that it could "alter, amend, or repeal" any part of Medicaid, the Court held that did not suffice to put the States on notice of the "transformation" wrought by the later statute. *Id.* at 581. Meanwhile, Congress built into Medicare Part D an express promise to "*not interfere*" in manufacturers' pricing negotiations with plan sponsors, 42 U.S.C. § 1395w–111(i)(1) (emphasis added). Yet the Program goes far beyond *interference* with private pricing arrangements—for the most successful drugs, it *supplants* them with forced sales at prices imposed by HHS fiat.

Again, Spending Clause statutes are akin to contracts. *Cummings*, 142 S. Ct. at 1570. And contract law forbids a party to use power secured through the contract to extort a modification of its terms. *E.g.*, *Alaska Packers' Ass'n v. Domenico*, 117 F. 99, 102 (9th Cir. 1902) (vessel's crew demanded higher wages only *after* leaving shore). That is the same dynamic created when funding recipients "build up reliance and dependence" and are then subject to "predatory leverage" when new conditions are imposed on the funding stream. J. Blumstein, *Enforcing Limits on the Affordable Care Act's Mandated Medicaid Expansion: The Coercion Principle and the Clear Notice Rule*, 2012 CATO SUP. CT. REV. 67, 74. And that is precisely what is going on here: Having used promises of market pricing to attract manufacturers and amass control over the prescription drug market, the Government now wants to use that control as the leverage to enable rescission of its original promises.

To be clear, the point is not that Medicare's pricing rules are forever frozen or impervious to amendment—just as the takeaway from *NFIB* is not that Congress could never repeal Medicaid. Rather, the point is that if Congress uses the reliance created by its own funding promises as a cudgel to induce "agreement" to new terms or conditions, that—together with the nature and size of the threat—is a strong indicator that Congress has crossed the line to unconstitutional coercion.

The Affordable Care Act—by cross-leveraging benefits, targeting a massive chunk of States' budgets, and imposing unforeseen conditions—coerced States to abandon their prerogatives under the *Tenth Amendment*. *NFIB*, 567 U.S. at 577–78. Meanwhile, the IRA coerces private actors to forfeit their rights under the *First and*

41

*Fifth Amendments*.  But the mechanism—what makes the "offer" unconstitutional—is exactly the same, regardless of the substantive rights at issue.  Private entities, no less than the States, can be subject to "'economic dragooning' and a 'gun to the head'" when the Government threatens the "ruinous" "loss of federal funds."  *Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (quoting *NFIB*, 567 U.S. at 581–82); *see also* M. Berman, *Coercion, Compulsion, and the Medicaid Expansion: A Study in the Doctrine of Unconstitutional Conditions*, 91 TEX. L. REV. 1283, 1316 (2013) (explaining that funding offers to states and "offers of benefits conditioned on the waiver of individual rights" raise same constitutional dilemma).  Indeed, if anything, protection for private recipients must be *more* robust for they, unlike States, lack the "political powers" and "institutional resources" to resist federal encroachment.  *Koslow v. Pennsylvania*, 302 F.3d 161, 174 (3d Cir. 2002).

**2.**     Nor did Congress intend to offer manufacturers any "voluntary" choice.  As noted, Congress projected that the "tax" penalty would raise no revenue because it knew no company could pay it.  *See supra* at p. 8.  And even the unrealistic option of withdrawing from Medicare and Medicaid was designed to be "illusory," *Butler*, 297 U.S. at 71.  While the penalty can be suspended if none of a manufacturer's products is covered by a Medicare or Medicaid agreement, the IRA also provides that the manufacturer cannot effectuate such a termination without giving notice at least 11 and as much as 23 months in advance.  42 U.S.C. § 1395w–114a(b)(4)(B)(ii).  So by the time a manufacturer is confronted with a particular price offer for a particular drug, the opportunity to make the supposed "choice" has long since expired.

Indeed, working backwards, the only way Merck could have extricated all of its products from Medicare by October 1, 2023—the first deadline by which it must "agree" or face daily penalties—would have been to give notice of intent to terminate by January 31, 2022. That was months before the IRA was even enacted, and more than a year before it became possible to predict that Merck would be subject to the Program. Accordingly, by the time the IRA became law, and certainly by the time the Government's cross-hairs focused on any targets, it was *already too late* for Merck to take any steps to escape the Program, as Congress designed it.

In response to litigation, CMS purported to develop an administrative "fix." The statute requires *manufacturers* to provide up to 23 months' notice to withdraw, but entitles *CMS* to terminate a manufacturer for "willful violation … or other good cause" in 30 days, after providing a "hearing." 42 U.S.C. § 1395w–114a(b)(4)(B)(i). CMS now claims it can exercise that power to *help* any manufacturer who wishes to avoid the Program without waiting the 11–23 months that Congress required. CMS Revised Guidance 120–21, 130–31. That is a highly dubious assertion of authority. In providing for the agency to terminate a manufacturer on its request, CMS has conflated two distinct statutory pathways—one for termination "[b]y the Secretary," the other for termination "[b]y a manufacturer." 42 U.S.C. § 1395w–114a(b)(4)(B). And in reading "good cause" to include a manufacturer's desire to avoid the Program, CMS flouts the canon of construction requiring that term to be understood in light of "the neighboring words with which it is associated," *United States v. Williams*, 553 U.S. 285, 294 (2008)—which here relate to manufacturer *misconduct*.

More importantly, whether valid or not, that *agency* end-run only confirms that *Congress* never intended to give manufacturers a genuine choice; if it had, CMS would not be scrambling to respond to lawsuits by rewriting the statute to allow for an exit option that the IRA's text puts beyond reach.  And that underscores the critical point: In enacting this novel scheme, Congress was imposing mandates, not offering a "deal" that could be "voluntarily" accepted.  Much like the Program itself, this would-be defense posits a genuine contract where none exists.

**B.**    **Threatening Merck's Access to Half the U.S. Drug Market To Compel Sales and Speech Is Unconstitutional.**

Taking a step back, *NFIB*'s reasoning is best understood as an application of the unconstitutional conditions doctrine, which "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).  And the Program clearly fails under this independent line of authority too.

In view of the risk that the Government's financial leverage will cause citizens to "relinquish[] [their] constitutional rights," *Frost*, 271 U.S. at 594, the Supreme Court closely scrutinizes funding conditions that implicate constitutional freedoms.  The unconstitutional conditions doctrine forbids using spending to extort "the Fifth Amendment right to just compensation," *Koontz*, 570 U.S. at 604, or to "compel[] a grant recipient to adopt a particular belief" or profess "the Government's view on an issue," *Agency for Int'l Dev.*, 570 U.S. at 218.  Conceptually, the goal of the inquiry is to reject unfair, abusive, or coercive mandates while still allowing the Government to define the boundaries of its own spending and funding programs.

In the speech context, compelling funding recipients "to profess a specific belief" is never permissible, since that regulation "by its very nature affects protected conduct outside the scope of the federally funded program." *Id.* at 218.  Indeed, the Supreme Court has long been "especially" protective of speech rights, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), and has "broadly rejected the validity of limitations on First Amendment rights as a condition to the receipt of a governmental benefit," *Elrod*, 427 U.S. at 359 (plurality op.).

In the takings context, the Government may condition benefits on forfeiture of property rights only if the condition has an "essential nexus" to the benefit and is "rough[ly] proportiona[l]" to it.  *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994); *see also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834–37 (1987); *Koontz*, 570 U.S. at 604 (confirming that *Nollan-Dolan* represents proper application of "unconstitutional conditions doctrine" in the takings context).

Under these principles, treating the IRA's demands as funding conditions only steers the Program headlong into the unconstitutional conditions doctrine.  Indeed, the Program has all the hallmarks of an unconstitutional condition—it uses leverage from *other* transactions to achieve the Government's objectives; offers a "deal" that no rational manufacturer could ever decline; and exploits the Government's Spending Clause power to compel speech and manipulate the marketplace of ideas.  This should be an easy case under the unconstitutional conditions doctrine, because it is obvious that Congress has sought to pressure manufacturers into abandoning their rights— not merely to define the boundaries of its own spending.

Starting with compelled speech, there is no serious argument that forcing the manufacturers to publicly "agree" that HHS's prices are "fair" is a lawful condition. *Agency for International Development* establishes that Congress cannot use funding conditions to require grantees "to pledge allegiance to the Government's policy." 570 U.S. at 220. The Program's compulsion to "agree" with HHS on what is a "maximum fair price" for the covered drugs is therefore constitutionally unsalvageable.

As for the Takings Clause, the IRA flunks both prongs of the *Dolan* test. Of course the Government could refuse to pay for a particular drug if the manufacturer did not agree to acceptable price terms for *that drug*—there, the Government is simply "defin[ing] the limits" of its own spending program. *Agency for Int'l Dev.*, 570 U.S. at 217. But the Program seeks to extort favorable terms for *one* transaction by threatening to terminate *other* transactions. The latter has no "essential nexus" to the former, *Dolan*, 512 U.S. at 386, precisely because the transactions are distinct. When a condition is "unrelated" to the withheld benefit, it amounts to "extortion." *Nollan*, 483 U.S. at 837–38. Again, the Government can decide what to subsidize through programs like Medicare, and how much it is willing to pay, but it cannot use those powers to penalize the exercise of constitutional rights in distinct transactions. *See Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980) (recognizing that "substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits" based on exercise of constitutional right); *Cedar Point*, 141 S. Ct. at 2080 (rejecting argument that union "access" mandate was legitimate condition because it was not "germane to any benefit provided" to employers).

At minimum, it is plainly not "rough[ly] proportiona[l]" to terminate coverage for *all* of a manufacturer's products unless it hands over *one drug* on dictated terms. *Dolan*, 512 U.S. at 391; *see also FCC v. League of Women Voters*, 468 U.S. 364, 400 (1984) (invalidating condition that required radio station receiving "only 1% of its overall income" from government grants to abstain "from all editorializing"). Leveraging vast pre-existing and unrelated payments to extort favorable terms for a distinct transaction marks a *coercive* condition, not a *proportional* one.  Scholars call such a condition "cross-collateralized," and treat it as "a powerful indicator the condition is disproportionate."  P. Hamburger, PURCHASING SUBMISSION 69 (2021). And the cross-collateralization here is especially stark, because the grant being used as leverage is so valuable, both in absolute and relative terms.  This cannot possibly satisfy the second prong of the *Dolan* test.

An analogy to antitrust law helps illustrate the point.  The Government's view is that a pharmaceutical manufacturer violates antitrust laws if it engages in "tying" by conditioning rebates for its portfolio of popular drugs on granting favored access to a single other product.  *See* Compl., *FTC v. Amgen, Inc.*, No. 23-cv-3053 (N.D. Ill. May 16, 2023) (challenging merger based on prospect of such tying).  The Program is the mirror image of such a scheme.  By analogy, the Government wields "market power" as the ultimate payor for Medicare and Medicaid.  *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006) (tying claims are viable where "defendant has market power").  Through the Program, the Government conditions access to that *entire market*—nearly half of all U.S. drug sales—on a manufacturer's "agreement"

to sell *one product* at a massive discount.  In antitrust terms, the Government thus abuses its control over the "tying" market (Medicare and Medicaid) to "force" manufacturers to hand over the "tied" product (the selected drug) at a preferred price. *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13–14 (1984); *see also, e.g.*, Compl., *United States v. Google LLC*, No. 23-cv-00108 (E.D. Va. Jan. 24, 2023), at 138 (alleging abuse of market power over "'must-have'" advertisement exchange to "coerce publishers to license" distinct product).  The Government can hardly allege that such behavior is *anticompetitive* when a private monopolist engages in it, yet deny that the same behavior is *coercive* when the Government does so as a public monopsonist.

For all of these reasons, treating the Program as a condition on federal funds would not save it—that construction would merely render it unlawful "coercion" to pressure manufacturers to "giv[e] … up" their constitutional rights. *Koontz*, 570 U.S. at 604.  At bottom, however viewed, the Program is simply a way for the Government to take manufacturers' private property and to conceal that it is doing so.  That is unconstitutional, period.

## **CONCLUSION**

The Court should enter judgment for Merck and grant its requested relief.

Dated: July 11, 2023

Respectfully submitted,

*/s/ Jacob ("Yaakov") M. Roth*
Yaakov M. Roth (D.C. Bar 995090)
Megan Lacy Owen (D.C. Bar 1007688)
Brinton Lucas (D.C. Bar 1015185)
John Henry Thompson (*admission pending*)
Louis J. Capozzi III (*admission pending*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20012
(202) 879-3939

*Counsel for Plaintiff*
*Merck & Co., Inc.*