IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MERCK & CO., INC., <br><br> Plaintiff, <br><br> v. <br><br> XAVIER BECERRA, U.S. Secretary of Health & Human Services, *et al.* <br><br> Defendants. | Civil Action No. 1:23-cv-01615 |

**DECLARATION OF PATRICK T. DAVISH**

I, Patrick T. Davish, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am the Associate Vice President of Global Market Access at Merck & Co., Inc. ("Merck"). I submit this declaration in support of Merck's Motion for Summary Judgment. This declaration is based on my personal knowledge.

2. I have been employed by Merck for approximately 30 years. In my current role, I am responsible for, among other things, Merck's operations relating to the Inflation Reduction Act's "Drug Price Negotiation Program." I report to Avi Benshoshan, who is the Senior Vice President of Global Market Access.

3. I have personal knowledge of the Merck products that will be covered by the Medicare Drug Price Negotiation Program (the "Program"), the revenues those products generate, and the investments associated with developing them. I also have personal knowledge of the structure and operation of the Program under the terms of the Inflation Reduction Act ("IRA") and guidance from the Centers for Medicare & Medicaid Services ("CMS"), an agency within the Department of Health and Human Services ("HHS").

### *The Program Will Cover Merck's Products.*

4. Merck invests billions of dollars every year to develop new medications and therapies. Only a small percentage of those potential products ultimately secure FDA approval and are successfully marketed.

5. Merck developed and markets JANUVIA® (sitagliptin) ("Januvia"), a breakthrough medication used to treat type 2 diabetes.

6. Januvia is a dipeptidyl peptidase-4 inhibitor (DPP-4i). It is believed to exert its actions in patients with type 2 diabetes mellitus by slowing the inactivation of incretin hormones, which are part of an endogenous system involved in the physiologic regulation of glucose homeostasis.

7. On October 16, 2006, the United States Food and Drug Administration ("FDA") first approved Januvia for use as an adjunct to diet and exercise to improve glycemic control in patients with type 2 diabetes. Januvia was approved both as monotherapy and in combination with metformin or a thiazolidinedione when diet and exercise, in combination with Januvia, do not provide adequate glycemic control.

8. Januvia was the first DPP-4i approved in the United States, providing an important new treatment option for patients with type 2 diabetes.

9. Merck has been a leader in diabetes clinical research, having conducted more than 50 sitagliptin Phase 2/3 clinical trials involving more than 40,000 patients with type 2 diabetes. Merck's research has included focused studies in elderly and pediatric populations, as well as in patients with pre-existing cardiovascular conditions and chronic kidney disease. As of June 2023, approximately 500 trials studying Januvia across a wide

variety of conditions and treatment settings have been recorded in the ClinicalTrial.gov database.

10. Januvia is registered and approved in approximately 130 countries, including the United States.

11. Since 2006, approximately 130 million prescriptions for Januvia have been filled in the United States.

12. Merck obtained multiple patents securing its intellectual property in Januvia, of which at least one patent remains operative. The FDA first approved Januvia on October 16, 2006. For these reasons, Januvia will be a "qualifying single source drug" under the IRA. *See* 42 U.S.C. § 1320f–1(e)(1)(A).

13. Based on past and current spending levels within Medicare, Januvia will be subject to the IRA's so-called "negotiation" regime in September 2023, when HHS announces the first set of drugs covered by the Program.

14. Merck also developed and markets JANUMET® (sitagliptin and metformin HCL) ("Janumet"), another medication used to treat type 2 diabetes.

15. Janumet combines two antihyperglycemic agents with complementary mechanisms of action to improve glycemic control in patients with type 2 diabetes: sitagliptin, a dipeptidyl peptidase-4 inhibitor (DPP-4i), and metformin hydrochloride, a member of the biguanide class. Sitagliptin is believed to exert its actions in patients with type 2 diabetes by slowing the inactivation of incretin hormones, which are part of an endogenous system involved in the physiologic regulation of glucose homeostasis. Metformin decreases hepatic glucose production, decreases intestinal absorption of

glucose, and improves insulin sensitivity by increasing peripheral glucose uptake and utilization.

16. On March 30, 2007, the FDA first approved Janumet for use as an adjunct to diet and exercise to improve glycemic control in adult patients whose type 2 diabetes is not adequately controlled through the use of metformin or sitagliptin alone, as well as in patients already being treated with the combination of sitagliptin and metformin.

17. Janumet was the first fixed-dose combination of a DPP-4i and metformin in the United States, providing an added convenience for patients on combination therapy. As of June 2023, approximately 36 trials studying Janumet have been recorded in the ClinicalTrial.gov database.

18. Janumet is registered and approved approximately 80 countries, including the United States.

19. Since 2007, approximately 39 million prescriptions for Janumet have been filled in the United States.

20. Merck obtained multiple patents securing its intellectual property in Janumet, of which at least one patent remains operative. The FDA first approved Janumet on March 30, 2007. For these reasons, Janumet will be a "qualifying single source drug" under the IRA. *See* 42 U.S.C. § 1320f–1(e)(1)(A).

21. Merck has also developed and markets Janumet XR, a formulation of Janumet that delivers sitagliptin immediately and metformin over an extended period.

22. Merck obtained multiple patents securing its intellectual property in Janumet XR, of which at least one patent remains operative.

23. The FDA first approved Janumet XR on February 2, 2012.

24. Janumet and Janumet XR will be treated as a single product under the IRA and CMS's implementation thereof.

25. Based on current and expected spending levels within Medicare, Janumet and Janumet XR will be selected for "negotiation" and forced sales in the Program's second cycle.

26. Merck also developed and markets KEYTRUDA® (pembrolizumab) ("Keytruda"), a groundbreaking cancer treatment.

27. Keytruda is a monoclonal antibody that binds to the PD-1 receptor and blocks its interaction with PD-L1 and PD-L2, releasing PD-1 pathway-mediated inhibition of the immune response, including the anti-tumor immune response.  The FDA approved Keytruda on September 4, 2014, for the treatment of patients with unresectable or metastatic melanoma and disease progression following ipilimumab and, if BRAF V600 mutation positive, a BRAF inhibitor.  Approval for this indication was accelerated based on tumor response rate and durability of response, and Keytruda received full FDA approval for this indication, as well as an expanded indication in melanoma, on December 18, 2015.

28. As of March 2022, approximately 54,000 patients have been treated with Keytruda through Merck's clinical development program, one of the industry's largest immuno-oncology clinical research programs.  Merck's research seeks to understand Keytruda's role in treating a variety of cancer types, as well as the factors that may predict a patient's likelihood of benefitting from treatment with Keytruda.  As of June 2023, approximately 2,000 trials studying Keytruda have been recorded in the ClinicalTrial.gov database across a wide variety of cancers and treatment settings.

29. As of June 2023, Keytruda is approved in the United States for 35 indications as for 16 tumor types and 2 that are tumor-agnostic (MSI-H pan tumor and TMB pan tumor). Keytruda has demonstrated a statistically significant overall survival benefit in 13 different types of cancer.

30. As of March 2023, approximately 530,000 patients in the United States have been treated with Keytruda.

31. Merck obtained multiple patents covering Keytruda and innovation related to Keytruda, of which at least one patent remains operative. The FDA first approved Keytruda on September 4, 2014. For these reasons, Keytruda will be a "qualifying single source drug" under the IRA at the relevant time. *See* 42 U.S.C. § 1320f–1(e)(1)(B).

32. Based on current and expected spending levels within Medicare, Keytruda will be selected for "negotiation" and forced sales in the Program's third cycle.

### *The Program Will Compel Merck To Convey Views That It Rejects*

33. Once HHS selects these products for the Program, Merck will have 30 days to "enter into" a "manufacturer agreement" with HHS. 42 U.S.C. § 1320f–2(a). That document, which HHS will make available to the public, will pronounce Merck's "agreement" to participate in the Program's "negotiations." It will obligate Merck to accept the *product* of those "negotiations"—what the IRA calls the "maximum fair price"—and to sell its drugs at that price. CMS will implement this requirement through a signed agreement that will set forth the terms of Merck's participation in the Program.

34. Merck will thus necessarily communicate to the public that it will voluntarily enter *bona fide* negotiations with HHS and that those negotiations will culminate in an agreed-upon price that Merck considers "fair."

35. Merck rejects every premise behind the IRA's "manufacturer agreement" and the messages it forces Merck to communicate.

36. *First*, Merck does not "agree" that HHS's selection of its drugs will initiate *bona fide* price "negotiations." To the contrary, Merck will be at HHS's mercy throughout the process. The IRA sets a price ceiling that is intentionally well below the drug's market value. While the IRA allows Merck to submit a "counteroffer" to HHS, HHS is free to ignore it altogether in its final decision. HHS's price-setting discretion is just as unrestrained at the end of the "negotiation" process as it is at the beginning. None of this resembles anything like the "negotiations" Merck undertakes in the course of its ordinary business.

37. *Second*, Merck rejects the notion, embodied in the "manufacturer agreement," that it will *voluntarily* participate in the Program's "negotiations" and accept their results. Merck's signing of a "manufacturer agreement" and its participation in the "negotiation" process are coerced through massive penalties. If Merck refuses to "agree" to negotiate, it must pay an escalating daily "excise tax" that starts at 186% and eventually reaches 1,900% of the drug's daily revenues from all sources. For Januvia, that would amount to a tax bill of tens of millions of dollars on the very first day of refusal to enter an "agreement," soon escalating to hundreds of millions of dollars per day. As a result, Merck will be forced to sign a "manufacturer agreement" despite its fundamental opposition to the content, aims, and messages of that "agreement."

38. *Third*, Merck rejects the notion, also embodied in the "manufacturer agreement," that the price HHS dictates at the end of the "negotiation" process is the "maximum fair price." That label communicates a viewpoint that Merck opposes. In particular, the IRA's characterization of HHS's preferred price as the only "fair" price

contradicts Merck's strongly held view of the best way to develop and market cutting-edge pharmaceuticals. Merck knows that its products must be priced to incentivize and support the incredibly expensive process of researching, developing, and securing FDA approval for breakthrough products. Insisting on below-market prices is not "fair" to anyone—including patients who depend on the development of new life-saving drugs.

39. After Merck is coerced into signing the "manufacturer agreement" under pain of massive penalties, the so-called "negotiation" process will begin in earnest. HHS will issue an "initial offer" bound only by the IRA's requirement that it represent a discount of at least 25% to 60% from market value. Merck will then have 30 days to accept HHS's offer or submit a counteroffer. But nothing prevents HHS from adhering to the same price contained in its initial offer.

40. The Program's first round of negotiations "shall end" by August 1, 2024—just 11 months after HHS announces Januvia's selection. By that date, Merck must submit a response to HHS's final offer, either accepting or rejecting it.

41. Merck must "accept"—or as the IRA puts it, "agree to"—HHS's final "maximum fair price." *See* 42 U.S.C. § 1320f–2(a)(1). If Merck does not "agree to" the final offer that HHS considers "fair," Merck will face the same indefinite daily penalties it would incur by failing to enter the initial "manufacturer agreement." *See supra* ¶ 37.

42. Again, Merck rejects every premise behind this final "agreement" to sell at the Government's "fair price" and every message it forces Merck to communicate.

43. *First*, describing this final step as an "agreement" communicates that the parties have reached a meeting of the minds following a series of good-faith negotiating

sessions. For the reasons described above, that is wrong: Merck must comply with HHS's final decision under threat of draconian financial penalties.

44. *Second*, the very notion of "agreement" to HHS's price communicates the message that Merck has acted, and will act, voluntarily. That is false; at every step of the process, the IRA's coercive excise tax forces Merck to play along.

45. *Third*, Merck rejects the notion that HHS's dictated price is "fair." That message—which Merck will necessarily communicate by "agreeing" to sell at HHS's price—is inimical to everything Merck believes and knows about its industry and products.

46. Merck does not wish to serve as a mouthpiece for the Program. But that is precisely what Merck's coerced participation in the Program will accomplish. By signing an initial manufacturer agreement, going through the "negotiation" process, "agreeing" to the price dictated unilaterally by HHS, and selling its products at that price, Merck will be forced to communicate messages with which it deeply disagrees.

### *The Program Will Compel Forced Sales of Merck's Products.*

47. Once the Program's process is complete, and Merck has been forced to "agree" to sell its drugs at a massively discounted "fair" price, Merck must provide "access to such price" to eligible individuals and entities participating in Medicare. 42 U.S.C. § 1320f–2(a)(1). Merck cannot afford to do anything else: Failure to sell the product indefinitely at HHS's price would trigger civil monetary penalties of ten times the difference between the price charged and the mandated price, *id.* § 1320f–6(a), plus an additional penalty for violation of the negotiated price "agreement," *id.* § 1320f–6(c). Those penalties are too large to permit resistance to HHS's forced sales.

48. Once HHS compels Merck to sell its drugs at the dictated price, sales must continue at that price (indexed only based on inflation) until HHS determines that a generic or biosimilar version of the drug has been approved and marketed, *id.* § 1320f–1(c)(1), or the drug is selected for "renegotiation" through the same basic process, *id*. § 1320f–3(f)(2). Thus, the Program forces Merck to sell its drugs at a massive discount for an indefinite period. In concrete terms, Merck will be compelled to transfer its patented products to others at a fraction of fair market value.

### ***Merck's Participation in the Program Is Not Voluntary.***

49. The IRA's Program was not presented to Merck as a voluntary condition on participation in, or reimbursement through, Medicare or Medicaid. In particular, Merck had no notice that HHS would impose anything like the Program or its penalties when Merck entered Medicare Part D. To the contrary, Merck entered Medicare Part D with explicit congressional reassurance that market forces—not Government-orchestrated "negotiations"—would determine drug prices under the program. *See* 42 U.S.C. § 1395w–111(i).

50. The only way for Merck potentially to lift the coercive threat of the IRA's excise-tax penalty is to terminate *all* of its Medicare Part D manufacturer-discount agreements and Medicaid rebate agreements. *See* 26 U.S.C. § 5000D(c). But without those agreements in place, Merck could not receive *any* payments for drugs reimbursed by Medicare Part B, Medicare Part D, or Medicaid. Together, those programs constitute nearly half of the U.S. prescription drug market.

51. Merck cannot exit that share of the market, a step that would cost the company billions in revenue and leave tens of millions of patients without access to their

medications. Thus, Merck's decision to remain subject to the Program is not voluntary, but rather the predictable consequence of overwhelming coercion.

52. Proving that the IRA did not offer a genuine choice or condition, Congress designed the statute to prevent Merck from withdrawing from Medicare in time to avoid the first round of price mandates. Merck will be compelled to sign an agreement submitting to forced sales of Januvia by October 1, 2023. But Congress provided that a manufacturer's termination of its Medicare Part D agreements is effective only after 11 to 23 months. *See* 42 U.S.C. § 1395w–114c(b)(4)(B)(ii). Thus, under Congress' design, to avoid penalties for failure to sign the October 1 "agreement," Merck would have needed to terminate all relevant Medicare and Medicaid contracts by January 31, 2022—months before the IRA was even enacted. Merck did not, and could not, know to do so.

### *The Program Will Harm Both Merck and the Nation.*

53. The Program will have devastating effects on Merck's ability to develop innovative solutions to patients' problems and public-health crises. Merck and its peer companies have made the United States the center of lifesaving pharmaceutical innovation. Januvia, Janumet (along with Janumet XR), and Keytruda are shining examples of what the American pharmaceutical sector can accomplish. These drugs improve and extend the lives of millions of Americans in ways once thought impossible. But Merck's ability to develop breakthrough cures and therapies depends on massive investments in numerous projects, of which just a handful will bear fruit and receive FDA approval. Merck's investments in a new drug often run into the billions of dollars. And the risk is enormous: Only a small percentage of drugs that make it to clinical testing are approved by the FDA, and only a fraction of approved drugs recoup their development costs.

54. It is therefore vital for Merck to be able to charge market prices for that tiny subset of drugs that not only succeed, but achieve groundbreaking results. Because the IRA targets *exactly* those drugs for unilateral HHS price caps, it will substantially hinder Merck and its peers as they undertake the expensive and arduous work of innovation.

55. The crucial example of cutting-edge cancer research provides a vivid illustration of the IRA's devastating consequences. In general, new cancer treatments are first deployed to combat late-stage metastatic disease. In part, that is because risk–benefit considerations—essential to regulatory approval—are initially most favorable for patients facing the worst prognoses. Only after a new treatment proves successful in treating late-stage cancer will a manufacturer transition its product to earlier stages—where the possibility of durable remission is greatest. But the IRA's countdown to selection for price "negotiations" begins when a drug is initially approved. Thus, by the time a drug proves itself as a late-stage treatment, opening the door to early-stage trials, the IRA will have decimated its profitability. In this way, the IRA will significantly impair the efforts of Merck and its peer companies to invest in promising new therapies that have brought us to the doorstep of major breakthroughs in the fight against cancer.

56. A similar dynamic will plague efforts to secure approval for new uses of established products. Many pharmaceutical breakthroughs have entered the market through this route: A drug is approved to treat one condition, but post-approval research and trials reveal equivalent or perhaps greater benefits as a treatment for a different disease. Indeed, it is often more cost-effective to pursue new applications of existing products because the manufacturer will possess extensive evidence regarding the drug's pharmacokinetics, toxicology, safety and efficacy, and the like. But the IRA makes post-

approval research and development far less attractive for the most successful drugs in a manufacturer's portfolio. Once such a drug has been approved for *any purpose* for 9 years (for small-molecule drugs) or 13 years (for biologics), the IRA's price mandates will eliminate much of the manufacturer's potential return on its investments.

57. As a result of Merck's coerced participation in the Program, Merck will suffer massive economic injuries, will be forced to give up its patented personal property at massive discounts, and will express Government messages with which it strongly disagrees. None of this is voluntary; the threat of the IRA's enormous excise tax and civil penalties will compel Merck to act. So will the incredibly destructive consequences of withdrawing wholesale from Medicare and Medicaid. Relief in this suit represents the only way to prevent Merck's imminent injuries and vindicate its rights under the First and Fifth Amendments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: 6/27/23

Patrick T. Davish